MARJORIE N. DEAN, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

VIRGINIA DEAN GRANT-LAWSON, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

ETHEL X. NORTHUP, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 10018, 10019, 10020. Promulgated January 8, 1948.

*F. N. Furber, Esq.*, for the petitioners.
*E. C. Adams, Esq.*, for the respondent.

## OPINION.

HARLAN, *Judge*: Petitioner contends that by virtue of the provisions of sections 112 (b) (3) and 112 (g) (1) (E), I. R. C.,[1] North Star, in December 1941, accomplished a reorganization for which no gain or loss is recognized to the stockholders.

Respondent argues that the reorganization, consisting of a recapitalization, was but a subterfuge whereby a part of North Star's surplus was channeled to the preferred stockholders and that the taxpayers thereby received taxable capital gain in the year when the preferred stock was received.

When this recapitalization occurred it would seem to be established that petitioners' contention had been approved by the Board of Tax Appeals in *Elmer W. Hartzell*, 40 B. T. A. 492. In that case the

[1] SEC. 112. RECOGNITION OF GAIN OR LOSS.

\*　　\*　　\*　　\*　　\*　　\*　　\*

(b) EXCHANGES SOLELY IN KIND.—

\*　　\*　　\*　　\*　　\*　　\*　　\*

(3) STOCK FOR STOCK ON REORGANIZATION.—No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization.

\*　　\*　　\*　　\*　　\*　　\*　　\*

(g) DEFINITION OF REORGANIZATION.—As used in this section \* \* \* and in section 113 \* \* \*

(1) The term "reorganization" means \* \* \* (E) a recapitalization.

taxpayer had received preferred stock in exchange for his common stock in pursuance of a plan of the stockholders so designed that the older stockholders of the corporation would turn the corporate management over to a group of younger stockholders and that the latter would acquire all of the voting common stock, while the older stockholders would receive the nonvoting preferred stock. The Board approved this recapitalization as a tax-free reorganization. This decision was later acquiesced in by the Commissioner. (C. B. 1939-2, p. 16.)

However, in the case at bar the Commissioner contends that the present case is controlled by the recent decisions of the United States Supreme Court and the Court of Appeals for the Seventh Circuit in the recent cases of *Adams* v. *Commissioner*, 331 U. S. 737; *Bazley* v. *Commissioner*, 331 U. S. 737; and *Heady* v. *Commissioner*, 162 Fed. (2d) 699.

In the *Bazley* case the taxpayer and his wife owned all of the capital stock except one qualifying share. There were 1,000 shares with a par value of $100 each. Under the recapitalization plan each old share was exchanged for 5 new shares having no par value and a stated value of $60. In addition debenture bonds of a face value of $400,000, payable in 10 years but callable at any time, were distributed pro rata among the stockholders. The corporation had an earned surplus of $855,783.82. The Supreme Court, in sustaining the decision of the Tax Court, held that for a recapitalization to constitute a tax-free reorganization it must not "exempt from payment of a tax what is a practical matter of realized gain." More particularly, the Court said:

In the case of a corporation which has undistributed earnings the creation of new corporate obligations which are transferred to stockholders in relation to their former holdings so as to produce for all practical purposes the same result as the distribution of cash earnings of equivalent value cannot obtain tax immunity because cast in the form of a recapitalization-reorganization.

The Court held that the debentures issued were virtually cash becar- they were callable by a corporation controlled by those holding t. debentures.

The *Adams* case in its legal aspects was similar to the *Bazley* cas

In *Heady* v. *Commissioner*, *supra*, two stockholders owning all of the stock in a corporation, which consisted of 1,000 shares of no par value, desired to sell the stock. Realizing no success, a plan was devised to employ a practical manager having special ability and background to operate the corporation and ultimately purchase the stock. The corporation was recapitalized by substituting 1,000 shares of $1 par value stock for the old issue and issuing debenture bonds in the amount of $135,000. The corporate surplus was $103,000. The debenture bonds were issued pro rata to the old stockholders. The contract of employment with the new manager permitted him to buy

the capital stock of the corporation as rapidly as he was able to retire the debenture bonds, so that when the bonds were retired he would own the corporate assets. The Court held that the purpose of this recapitalization was not a corporate business purpose, but merely a business purpose of the stockholders, and said:

> The effect of this was to syphon off that part of the book value of the shares attributable to profits and earnings accumulated after February 28, 1913, thereby effecting a distribution of those earnings and profits.

A number of distinctions between the case at bar and the three cases relied upon by the Commissioner would seem to be apparent. In the case before us, no debenture obligations were issued. The preferred stock was not distributed in proportion to the common stockholdings, but in exchange therefor; the petitioners retained no control when they surrendered their common shares. The purpose behind the distribution of preferred shares in the case at bar was admitted to be to transfer voting control from one group of stockholders to another, and an issue of debenture bonds or preferred stock in proportion to the stockholdings would have been useless for this purpose.

The respondent argues that the setting aside in the surplus account of $169,125 for the purposes set forth in our findings was tantamount to the conversion of this amount of the corporate reserves to the ultimate use of the preferred stockholders.

We would be unable to support the respondent's premise or to accept his conclusions as affecting any capital gain to the preferred stockholders in 1941 even if the premise were true. In the *Bazley* case the Court, in commenting upon bookkeeping entries in the corporation's books in that case, stated that, whatever their effect might be on the corporate books, such entries could not affect the substantive rights of the security holders as represented in the inherent nature of their securities. We are unable in the case at bar to see in what manner the bookkeeping of North Star could add to or take from the preferred stockholders' interest, even though an admitted reserve were set up. We shall not attempt to pass upon the effect of these bookkeeping entries, except to note that the petitioner on brief states that the addition of $169,125 to the reserve was obtained by multiplying the number of preferred shares issued, 2,818¾, by $60, the excess of the consideration received for a preferred share over its stated value of $40, and that the deduction of the same $169,125 was obtained by multiplying the number of common shares exchanged, 2,255, by $75, which is the excess of the stated value of a common share over its par value. While all of this is somewhat confusing, two facts would seem to be very simple: (1) In 1941 the preferred stockholders received no gain, either capital or income, as a result of said entries; and (2) since the amount added to the surplus equals the amount

deducted therefrom, the surplus at the end of the transaction seems to be unaffected.

The respondent also complains that there was no intention at the time of the authorized issue of the preferred stock to issue it to all stockholders, and he therefore questions the *bona fides* of the transaction. It is to be noted in the *Hartzell* case that the same situation existed, although the result was achieved by a more roundabout course than in the case at bar.

The respondent also complains that the recapitalization lacked sincerity because nothing was accomplished by the recapitalization, at least until after September 1945, when the common stock was split into ten shares for one and a new issue of $4 preferred stock was authorized.

It is to be noted, however, that after the 1941 recapitalization a new manager was employed, who testified that, if the possibility of the corporation devolving upon inexperienced women upon the death of William G. Northup had continued and if he had not been promised the right to purchase into the corporate stock, he would not have been interested in remaining with the company. This promise made to this manager was carried out in September 1945, by the authorized sale of stock to him and other employees.

It is also to be noted that the intervention of the war produced new problems making the recapitalization contemplated in December of 1941 no longer such an urgent necessity and at the same time the new problems made such a recapitalization more difficult than it was in December of 1941. However, with the close of the war the directors of North Star proceeded as was planned in 1941 and a large portion of the stock sales and the plans for stock sales initiated in September 1941 would not have been possible without the reorganization of 1941 unless a similar reorganization could have been effected prior to September of 1945.

It is therefore our conclusion that the law of the *Elmer W. Hartzell* case, *supra*, is controlling under the facts in the case at bar.

Reviewed by the Court.

*Decisions will be entered for the petitioners.*