ALAN O. AND ANN T. HICKOK, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

RAYMOND T. AND SALLY HICKOK, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

H. JUSTINE HICKOK, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 63224, 63255, 63256. Filed April 13, 1959.

*J. Ernest Brophy, Esq.*, and *Rupert G. Fain, C.P.A.*, for the petitioners.

*John J. O'Toole, Esq.*, for the respondent.

MULRONEY, *Judge:* The respondent determined the following deficiencies in the petitioners' income tax:

| Docket No. | Petitioner | Year | Deficiency |
|---|---|---|---|
| 63224 | Alan O. and Ann T. Hickok_____ | 1953 | $8,441.44 |
| 63255 | Raymond T. and Sally Hickok_____ | 1953 | 8,437.62 |
| 63256 | H. Justine Hickok_____ { | 1953 | 10,798.71 |
|  |  | 1954 | 214.23 |

The issue in these consolidated cases is whether the exchange by petitioners of their stock in the Hickok Manufacturing Co., Inc., for 20-year 6 per cent debenture bonds of the same corporation qualifies as a nontaxable exchange under sections 112(b)(3) and 112(g)(1)(E) of the Internal Revenue Code of 1939.

### FINDINGS OF FACT.

Some of the facts have been stipulated and they are so found.

Alan O. and Ann T. Hickok, husband and wife, are residents of Penfield, New York; Raymond T. and Sally Hickok, husband and wife, are residents of Rochester, New York; and H. Justine Hickok is a resident of Rochester, New York. The petitioners in these dockets filed their income tax returns for the years here involved with the district director of internal revenue at Buffalo, New York. Petitioners in Docket Nos. 63224 and 63255 filed joint returns for the year 1953.

Hickok Manufacturing Co. Inc., hereinafter sometimes called the Hickok Company, was organized under the laws of the State of New York in 1917, with its office and principal place of business in Rochester, New York. In that same year, S. Rae Hickok transferred to the Hickok Manufacturing Co., Inc., the business of manufacturing a variety of belts, buckles, and similar articles in return for the issuance of 939 shares of the corporation's capital stock. The total authorized capital stock at the time of incorporation was 1,500 shares of $100 par value. In 1920 the number of authorized shares was increased to 4,000 shares of common stock, with a par value of $100 and 2,000 shares of preferred stock with a par value of $100. In 1925 the number of authorized shares of common stock was increased to 6,000 shares, with a par value of $100.

S. Rae Hickok died on December 10, 1945, and control of the corporation passed to Lincoln Rochester Trust Company, Alan O. Hickok, and Raymond T. Hickok as executors of the estate of S. Rae Hickok. Alan and Raymond are sons of the decedent. Upon their father's death Raymond became president of the corporation and Alan, vice president.

The minutes of a special meeting of the board of directors, held on January 11, 1946, state that Raymond Hickok "outlined the idea of declaring a dividend on the outstanding common stock of the Company. * * * He also said that the Company was considering the question of going through recapitalization, and the general opinion of brokers and financial men was that if we [the company] were paying a dividend on our [its] stock it would make the possibility of public sale more in order." The minutes also show that after a general discussion, a motion for a 5 per cent per year dividend was adopted. On April 28, 1947, at a special meeting of the board of directors, the previously authorized capital stock was changed to 521,400 shares of common stock with a par value of $1 per share. Prior to the last date, all of the preferred stock had been retired and eliminated. Thereafter the estate of S. Rae Hickok sold shares of common stock to the Wertheim group of New York, the Bonbright group of Rochester, and to D. S. Rutty and his wife.

Disagreements arose between the Hickok Company's board of directors and the minority groups with respect to management policies. The advertising policy of the Hickok Company, which had been developed in conjunction with an outside advertising agency, had achieved a very high rating from a private research organization on the basis of interviews with magazine readers. Yet a member of the Wertheim group disparaged such advertising policy as very poor and suggested that the Hickok Company consider cutting out advertising in order to show a short-term profit for the company. The Wertheim group was critical of the salaries paid by the Hickok Company and, in April 1951, demanded from the company a list of all salaries paid to company officers and directors. At a board of directors meeting and at the annual stockholders meeting, both held in April 1951, the Wertheim group was critical of the company's relations with the Lincoln Rochester Trust Company on the ground that the bank was "straddling the fence three ways; as co-executor of the Estate, loaning money to the Estate, and granting a line of credit to the Corporation." At the annual meeting of stockholders of the Hickok Company in April 1951, there were represented a total of 491,848 shares out of a total of 521,400 shares issued and outstanding. Philip H. Gerner of Bonbright Company held proxies for 100,265 shares and George J. Skivington, connected with the Wertheim group, held proxies for 2,812 shares. These two representatives of minority groups of stockholders voted in the negative when the motion was presented to the meeting that all acts and transactions of the officers and directors during the preceding year be approved. At the stockholders meeting of April 1951, the Wertheim group requested the presence of

a court stenographer and made it apparent that they were searching for grounds to support a minority suit against the Hickok Company.

As a result of this hostility from the dissident minority groups, and as a result of a great deal of pressure from them, the Hickok Company agreed to employ a chief financial officer picked by the Wertheim group. This officer, George Cain, was employed by the Hickok Company for approximately 1½ years. He represented the minority group primarily, and he was repeatedly critical of the action of the officers and the management of the Hickok Company. He personally managed the financial division of the company as well as the "Lyle Avenue shipping operation and tabulating division." He discussed with the Hickok Company's officers at various times the company's selling policies, coordination of production to sales, and advertising policies, and on the whole he was critical with all of these policies.

In order to eliminate these dissident minority groups, the management of the Hickok Company began to explore plans of reorganizations. At the regular meeting of the board of directors held on February 25, 1952, the company attorney submitted his report "of his investigation of the Federal Income Tax angles that might develop in a proposed reorganization of this Company's capital stock structure." The minutes show that after some discussion of the subject "it was felt that a subordinated debenture bond issue rather than a preferred stock would be the most desirable for all concerned." It was suggested by one of the directors that this proposal should be cleared with the Lincoln Rochester Trust Company because it held a block of the Hickok Company's common stock as collateral on a loan to the Hickok estate, and its consent would be necessary if this common stock were to be subordinated to a new bond issue. Then the attorney for the Hickok Company and Gerner, representing the Bonbright interests, were authorized to meet in New York with the Wertheim group and "get their approval of the plan."

At the directors meeting on April 21, 1952, the company attorney and Gerner reported on their trip to New York to discuss the proposed reorganization plan with the attorneys for the Wertheim group and the report was to the effect that Wertheim's attorneys "were in agreement that the matter was feasible from its legal aspect." This report was followed by a discussion in which, as the minutes state, "the Directors indicated their feeling that if the minority stockholders could be eliminated it would be desirable from the Company's standpoint." There followed a discussion of details of the plans such as bond provisions and interest rates and a motion was unanimously adopted to employ Gerner of Bonbright & Company to de-

velop a plan "for the issuance of bonds to minority stockholders for their stock."

At the May 13, 1952, meeting of the board of directors, Gerner gave his report on the recapitalization plan which he had developed and his report on his trip to New York to confer with the New York stockholders about the plan. He stated that the New York stockholders were only interested in "being bought out" and he believed their stock could be bought for $5 a share.

On July 17, 1952, at a regular meeting of the board of directors, a proposal was discussed whereby funds would be borrowed on a first mortgage, and such funds used to acquire stock. It was recognized that the consent of stockholders not selling would be required. At this meeting it was the consensus of opinion that the other minority stockholders, including Ottilie Halley, the Shields estate, and the stockholders represented by Rutty, should be approached to see if they would consent to the placing of the required mortgage and for the use of a portion of the funds for the purchase of stock.

In August 1952 the board of directors authorized the president or vice president of the Hickok Company to accept a commitment for a mortgage and to arrange with the Lincoln Rochester Trust Company for an advance of sufficient funds to purchase the stock of the New York City group, provided, however, that the consent of Eleanor H. Shields, Ottilie Halley, the Bonbright interests, and the Rutty group, all minority stockholders, should first be obtained. The Shields interests and the Halley interests were extremely reluctant to give their consent and finally, in October 1952, after many meetings, these interests gave their consent for the Hickok Company to "negotiate for and * * * purchase at a price not less than $3.50 per share and not more than $4.00 per share, the outstanding shares * * * held by the group commonly referred to as the Wertheim stockholders * * * consisting of approximately 72,000 shares, together with one-third of the shares owned by Ottilie E. Halley and one-third of the shares owned by [Eleanor H. Shields], the same price to be paid for all said shares, and in the event that [the Hickok Company does] purchase or agree to purchase all said shares that [it] may borrow such sums of money payable on such terms as [the board of directors] may approve and * * * that [it] may mortgage [its] real estate and plant * * * to secure the repayment of the monies so borrowed." This consent was given only on the express condition that, in addition to the purchase from Shields and the Halley interests of one-third of their stock, the Hickok Company would find a purchaser for an additional one-sixth of each of their stock.

Both the Shields and the Halley interests said they would not give their consent unless Alan and Raymond would personally buy some of the common stock from each group. In order to gain the consent of these minority stockholders, Alan and Raymond each agreed to make the necessary purchases. Neither Alan nor Raymond had any desire to purchase such common stock as an investment, but both regarded such purchases as "a requirement of the overall agreement whereby [they] would be able to get this very hostile minority group out and yet satisfy the minimum requirements of the remaining minority group in the Rochester area."

On November 12, 1952, Alan borrowed $30,000 from the Central Trust Company and purchased 7,500 shares of common stock of the Hickok Company from Ottilie E. Halley and Eleanor H. Shields, pledging said shares as security for the loan. Prior to the purchase of these shares Alan owned 10 shares of common stock. On the same date, Raymond borrowed $30,000 from the Central Trust Company and purchased 7,500 shares of common stock of the Hickok Company from Ottilie E. Halley and Eleanor H. Shields, pledging said shares as security for the loan. Prior to the purchase of these shares, Raymond owned 10 shares of common stock. On November 21, 1952, the Hickok Company purchased for its treasury 71,098 shares of its common stock issued in the name of Wertheim & Company, and representing the New York City group, at a price of $4 per share. At the same time the Hickok Company purchased for its treasury 26,168 shares of its stock from Ottilie E. Halley and Eleanor H. Shields at the same price.

On February 24, 1953, the board of directors of the Hickok Company adopted a plan of recapitalization involving the creation of an issue of $1,000,000 face amount of 20-year 6 per cent subordinated debentures, dated April 1, 1953, and offering to the holders of the outstanding common stock, other than the estate of S. Rae Hickok, the right to exchange 13 shares of common stock for $100 face amount of said debentures. The estate of S. Rae Hickok had previously expressed its intention not to participate in the exchange. The debenture bonds were redeemable at the option of the Hickok Company on any date after December 31, 1959, and provisions were made for a sinking fund. The exchange was to be made with stockholders of record at the close of business March 10, 1953, and participation in the exchange was discretionary.

The following table shows the shares held by the various stockholders immediately before and after the exchange of debentures for

common stock, as well as the amount of debenture bonds received by those who participated in the exchange:

| Name | Shares held immediately prior to the 1953 exchange | Shares exchanged | Debentures received | Shares held after the exchange |
|---|---|---|---|---|
| Austin, Virginia R. | 4,407 | 4,407 | $33,900 | ---- |
| Blackman, Meyer | 500 | ---- | ---- | 500 |
| G. D. Bonbright & Co. | 13,000 | 13,000 | 100,000 | ---- |
| Brown, Robert A. | 1,250 | 1,248 | 9,600 | 2 |
| D. G. Clark Agency | 1,000 | ---- | ---- | 1,000 |
| Clemens, J. L. | 500 | ---- | ---- | 500 |
| Deal, Roy C. | 200 | ---- | ---- | 200 |
| Emery, H. F. | 1,820 | 1,820 | 14,000 | ---- |
| Fitzgerald, H. E. | 3 | ---- | ---- | 3 |
| Gilman, O. H. | 1,001 | 1,001 | 7,700 | ---- |
| Gleason, M. A. | 500 | ---- | ---- | 500 |
| Groff, Ed and Shapiro, S. H. | 3,000 | ---- | ---- | 3,000 |
| Halley, Ottilie | 19,687 | 9,178 | 70,600 | 10,509 |
| Hayms, Henry | 2,300 | ---- | ---- | 2,300 |
| Hickok, Alan O. | 7,510 | 7,501 | 57,700 | 9 |
| Hickok, H. Justine | 9,000 | 8,788 | 67,600 | 212 |
| Hickok, Estate of S. Rae | 268,075 | ---- | ---- | 268,075 |
| Hickok, Raymond T. | 7,510 | 7,501 | 57,700 | 9 |
| Hoffman, Charles J. | 250 | ---- | ---- | 250 |
| Holly, W. H. | 4,290 | 4,290 | 33,000 | ---- |
| Hoover, Herbert W., Jr. | 600 | ---- | ---- | 600 |
| Horn, Stephen Bennett | 6 | ---- | ---- | 6 |
| Johnson, E. Dean | 1,800 | 1,794 | 13,800 | 6 |
| Levy, Morrie | 1,500 | 780 | 6,000 | 720 |
| Lannie, Trust of George W. | 400 | 390 | 3,000 | 10 |
| McDermott, T. M. and C. A. | 2,600 | 2,496 | 19,200 | 104 |
| Mix, Edwin S. | 5,000 | 4,992 | 38,400 | 8 |
| Newcomb, A. T. | 750 | 364 | 2,800 | 386 |
| Nusbaum, G. A. | 13,000 | 13,000 | 100,000 | ---- |
| Nusbaum, Mary Jane | 4,400 | 4,394 | 33,800 | 6 |
| Ottley, C. A. | 221 | 221 | 1,700 | ---- |
| Platt, H. S. | 1,300 | 1,300 | 10,000 | ---- |
| Reibold, Elmer L. and Elma C. | 4,000 | 3,900 | 30,000 | 100 |
| Remington, John W. | 105 | ---- | ---- | 105 |
| Rollins, John W. | 2,000 | ---- | ---- | 2,000 |
| Ronne, R. H. | 250 | 247 | 1,900 | 3 |
| Rutty, D. S. | 4,901 | 4,901 | 37,700 | ---- |
| Rutty, Fannie | 9,373 | 9,373 | 72,100 | ---- |
| Sachs, Morris | 1,250 | ---- | ---- | 1,250 |
| Sage, Celista S. | 5,200 | 5,200 | 40,000 | ---- |
| Sage, F. Dwight | 1,300 | 1,300 | 10,000 | ---- |
| Schiff, Leo H. | 600 | ---- | ---- | 600 |
| Shields, E. H. | 16,500 | 16,497 | 126,900 | 3 |
| Silverstein, Lewis R. | 200 | ---- | ---- | 200 |
| Stensgaard, William L. | 505 | ---- | ---- | 505 |
| Stevenson, John D. | 5 | ---- | ---- | 5 |
| Wallace, William T. | 125 | ---- | ---- | 125 |
| Wiatrak, J. L. | 125 | 117 | 900 | 8 |
| Yant, McKee D. | 300 | ---- | ---- | 300 |
| Yant, McKee D., II. | 15 | ---- | ---- | 15 |

Before the exchange, the estate of S. Rae Hickok owned 63.21 per cent of the outstanding common stock of the Hickok Company, and after the exchange had taken place, the estate owned 91.14 per cent.

Each of the petitioners, Alan O. Hickok and Raymond T. Hickok, participated in the plan by exchanging 7,501 shares for $57,700 face value of debentures. The petitioner, H. Justine Hickok, exchanged 8,788 shares for $67,600 face value of debentures. None of the petitioners reported any income in their income tax returns for 1953 as a result of the exchange. The respondent, in his explanation of adjustments to net income in the notices of deficiency in these three dockets, treated these as exchanges in which gain or loss is recognized, and, accordingly, by placing a fair market value of $74 on each debenture

bond, he computed a short-term capital gain of $12,694 in each of Docket Nos. 63224 and 63255, and a long-term capital gain of $41,236 in Docket No. 63256.[1]

OPINION.

The issue is whether the exchange by the petitioners of common stock held by them in the Hickok Company for its 20-year 6 per cent subordinated debentures in 1953 constituted a nontaxable exchange within the meaning of sections 112(b)(3) and 112(g)(1)(E) of the Internal Revenue Code of 1939.[2] Section 112(b)(3) provides for the nonrecognition of gain or loss where "stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization." Section 112(g)(1)(E) includes a recapitalization in the definition of the term "reorganization."

The term "recapitalization," which is not defined in the Code, has a broad meaning and it has been held to apply to exchanges involving debentures. *Commissioner* v. *Neustadt's Trust*, 131 F. 2d 528, affirming 43 B.T.A. 848. The Supreme Court has held the term contemplates a "reshuffling of a capital structure within the framework of an existing corporation." *Helvering* v. *Southwest Corp.*, 315 U.S. 194. The 20-year debentures involved in this exchange were undoubtedly securities within the meaning of section 112(b)(3). *Wolf Envelope Co.*, 17 T.C. 471, appeal dismissed 197 F. 2d 864. Here the plan of the Hickok Company involved the issue of $1,000,000 of 20-year debentures, which, in part, were exchanged for 130,000 shares of the corporation's common stock. Twenty-eight of the corporation's stockholders participated in the exchange. Twelve of these relinquished their entire holdings of common stock. It would seem that, under these facts, there was a "recapitalization" and hence a "reorganization" and that the exchange of stock for debentures came within the nonrecognition provisions of section 112(b)(3).

Respondent's position is that the exchange of debentures for common stock was not the type of reorganization such as would result in the application of section 112(b)(3), for the courts have laid down certain requirements which must be present before it can be said a reorganization within the intendment of the statute is present. Respondent admits the plan of exchanging stock for debentures was a plan for recapitalization but the argument on brief is that the plan of recapitalization as set forth in section 112(g)(1)(E) "is but a form

---

[1] The deficiency in Docket No. 63256 for the year 1954 is based upon the respondent's disallowance of a capital loss carryover from 1953 claimed by H. Justine Hickok.

[2] All section references are to the Internal Revenue Code of 1939, as amended, unless otherwise noted.

of reorganization" and the cases which have enumerated certain necessary characteristics that must accompany the reorganization, are applicable here, and unless those elements are present a tax-free exchange under the statute is not achieved.

Respondent's main argument, and the one to which he devotes the bulk of his brief, is that the plan of recapitalization in the instant case cannot be held to be a reorganization under the statute because it is lacking in what is called "continuity of interest." The continuity-of-interest rule as first enunciated in *Pinellas Ice & Cold Storage Co.* v. *Commissioner*, 287 U.S. 462, set forth the principle that the transferor corporation in a reorganization must acquire a proprietary interest in the transferee corporation. There the corporation transferring the assets received the purchasing corporation's short-term notes. The Court said that the corporation transferring the assets must acquire an interest in the affairs of the transferee corporation more definite than that incident to the ownership of its well secured short-term notes. In *LeTulle* v. *Scofield*, 308 U.S. 415, the Court made it clear where "the consideration is wholly in the transferee's bonds, or part cash and part such bonds, * * * it cannot be said that the transferor retains any proprietary interest in the enterprise. On the contrary, he becomes a creditor of the transferee." Both the *Pinellas* and the *LeTulle* cases involved the consideration of a "merger or consolidation" of two corporations. Respondent contends the test of continuity of interest applies with equal force to a recapitalization case, although he admits on brief that the cases that have applied the continuity of interest test are not recapitalization cases.

We do not feel the "continuity of interest" principle should be applied to a recapitalization case. The purpose of these nonrecognition provisions is "to free from the imposition of an income tax purely 'paper profits or losses' wherein there is no realization of gain or loss in the business sense but merely the recasting of the same interests in a different form, the tax being postponed to a future date when a more tangible gain or loss is realized." *Commissioner* v. *Gilmore's Estate*, 130 F. 2d 791, affirming 44 B.T.A. 881; see also *Southwest Natural Gas Co.* v. *Commissioner*, 189 F. 2d 332, affirming 14 T.C. 81; *Electrical Securities Corp.* v. *Commissioner*, 92 F. 2d 593, affirming 34 B.T.A. 988.

In *Clarence J. Schoo*, 47 B.T.A. 459, where we held that the exchange of preferred stock for debentures of the same corporation constituted a recapitalization, we said:

The respondent contends that the statutory word "recapitalization" may not be read as meaning a type of statutory "reorganization" unless through it persists a continuation of the same proprietary interest; and that a substitution of bonds for shares breaks the proprietary interest and substitutes a creditor interest. To support this argument, reliance is principally placed on *LeTulle*

v. *Scofield*, 308 U.S. 415. This, however, is to take the *LeTulle* case out of its setting in the consideration of a "merger or consolidation" of two corporations under subdivision (A), and to apply it to a recapitalization of a single corporation. As a contemplated result of the "merger or consolidation" of two corporations, the individual taxpayer, for his shares in one of the corporations and other properties, received cash and bonds of the other corporation. This was something substantially different from what he gave up. It was not a mere reshaping of his interest in the same corporation through a recapitalization. * * *

In *Commissioner* v. *Edmond's Estate*, 165 F. 2d 715, affirming a Memorandum Opinion of this Court, involving a recapitalization in which old debentures were exchanged for new ones in the same corporation, the *LeTulle* case was distinguished as involving a *merger*, and the court said that the situation was different where a recapitalization took place. In *Wolf Envelope Co.*, *supra*, there were three types of exchanges, two of which were in controversy. The challenged exchanges were those in which new 5 per cent debenture bonds were received. The holders of old debenture bonds exchanged them for new ones of a later issue in the same face amount but containing terms and conditions substantially different. Also, the holders of class A common stock exchanged such shares for debenture bonds. We held that such exchanges constituted a recapitalization within the meaning of section 112(g). See also *Daisy Seide*, 18 T.C. 502.

In *Davis* v. *Penfield*, 205 F. 2d 798, affirming 105 F. Supp. 292, the court affirmed the District Court which had upheld as a recapitalization the exchange of preferred stock for debentures of the same corporation. In the opinion of the District Court in the *Penfield* case it was stated that the "continuity of interest" doctrine was not a requisite of a recapitalization, the court stating, "there appears nothing in the broad term 'recapitalization' or in the effective simplification of capital structure accomplished by the transaction under review to require any arbitrary continuity of interest in the case of an internal reorganization (recapitalization) involving a single corporation."

The foregoing cases are authority that the "continuity of interest" doctrine, which was developed by the courts to serve a necessary purpose in the merger and consolidation types of reorganizations, need not be a necessary ingredient in the cases where a recapitalization occurs. It is quite apparent that the considerations which make such a doctrine necessary in the merger and consolidation cases are simply not present in a recapitalization. A recapitalization of a single corporation often contemplates some change in interest, such as from stockholder to bondholder, and in a sense such a change might always be called an interruption of continuity. We have seen that the term "recapitalization" has a broad meaning. *Commissioner* v. *Neustadt's Trust*, *supra*. It cannot be that the term "recapitalization" in the statute includes a requirement of the continuance of the old interest in proprietary form when recapitalization plans so often contemplate

converting such interest to a nonproprietary form. We think that the "continuity of interest" doctrine has no application to a recapitalization such as took place in the instant case.[3]

Respondent devotes a few lines of his brief to an argument that this plan of the Hickok Company to exchange stock for debentures did not serve a business purpose (with *Heady* v. *Commissioner*, 162 F. 2d 699, as sole citation) and, therefore, cannot qualify as a reorganization under section 112(g). The business purpose rule appeared at an early date in *Gregory* v. *Helvering*, 293 U.S. 465, where the Court held that the particular plan there involved did not constitute a reorganization within the meaning of the Code. "The whole undertaking," said the Supreme Court, "though conducted according to the terms of subdivision (B), was in fact an elaborate and devious form of conveyance masquerading as a corporate reorganization, and nothing else." The whole thing was "[s]imply an operation having no business or corporate purpose—a mere device which put on the form of a corporate reorganization as a disguise for concealing its real character, and the sole object and accomplishment of which was the consummation of a preconceived plan, not to reorganize a business or any part of a business, but to transfer a parcel of corporate shares to the petitioner." In other words, the whole transaction was a *sham*. This, in essence, is the gist of the myriad cases applying the business purpose rule after the *Gregory* case. In *Bazley* v. *Commissioner*, 331 U.S. 737, the Supreme Court said that a " 'reorganization' which is merely a vehicle, however elaborate or elegant, for conveying earnings from accumulations to the stockholders is not a reorganization under § 112." Here, there is absolutely no indication that the plan of recapitalization was a sham, in that it was an elaborate artifice concealing its true purposes. In fact, even the respondent does not make such a contention. Nor does it appear that this was a mere subterfuge to siphon off earnings and profits to the stockholders. The fact that the majority stockholder in the Hickok Company did not participate in the exchange belies this.

The argument of the respondent is far from clear. He contends that this plan of recapitalization "did not serve a business purpose, but rather as in *Heady* v. *Commissioner, supra*, served a purpose personal to the Board of Directors which was controlled by the Estate of S. Rae Hickok."[4] Respondent argues that the estate, acting through the board of directors, "merely desired to remove the recalci-

---

[3] See Erwin N. Griswold, "Securities"—"Continuity of Interest," 58 Har. L. Rev. 705, 716–717.

[4] The *Heady* case is easily distinguishable in that it involved a plan which was no more than a subterfuge for drawing off corporate earnings and profits, citing the *Bazley* case. Moreover, in *Richard H. Survaunt*, 5 T.C. 665, affd. 162 F. 2d 753, we said, in upholding the validity of a reorganization, that it was immaterial "that the stockholders had a personal—as opposed to a corporate—reason for the arrangement."

trant interests" and that this was the only purpose served by the recapitalization.

It is abundantly clear from the testimony at the trial and the evidence of minutes of stockholders and directors meetings, that the Hickok Company was seriously hampered in its activities by a critical minority group of stockholders. This hostile group was critical of the advertising policies and the banking arrangements of the Hickok Company, it threatened a minority stockholders' suit, it succeeded in placing a representative in an important executive position and, in short, it threatened the successful and smooth operation of the corporation. All of the evidence presents a picture of an active, dissident minority which was attacking the management of the company and importuning the directors to do such things as stop all advertising in order to show a short-term profit, even though it might not be for the long-term good of the company. This minority was voting against even routine ratification of the acts of officers and directors. Any plan which sought to eliminate this hostile group, with its harassing tactics, certainly served a business purpose for the Hickok Company or at least the board of directors could reasonably regard and adopt the plan, admittedly for the purpose of eliminating this critical minority group, as a plan that would be beneficial to the company. As somewhat in point, see *Marjorie N. Dean*, 10 T.C. 19, where we held a recapitalization plan which had for its purpose an inducement to inactive stockholders to surrender their voting stock served a business purpose. In fact, the respondent implicitly recognizes a business purpose when he concedes on brief that the purpose of the exchange of stock for debentures was "to eliminate certain minority stockholders who were in disagreement with management policies."

It is quite apparent from all the evidence that the entire plan of recapitalization was set in motion by the desire to eliminate the hostile minority groups, especially the Wertheim and the Bonbright groups. In November 1952 the Hickok Company was compelled to purchase 71,098 shares of its common stock issued in the name of Wertheim & Company.[5] To obtain the necessary cash, the company was forced to place a mortgage on its plant and real estate, which, in turn, required the consent of other minority groups, namely, the Shields and the Halley groups. These latter groups gave their consent but this consent was conditioned on the purchase by Alan and Raymond, personally, of some 15,000 shares of common stock from

---

[5] We cannot tell from the record the exact amount of common stock originally purchased by the Wertheim group, the Bonbright group, and the Rutty group. There is evidence that at a stockholders meeting in April 1951 the Bonbright and Wertheim groups held proxies for 103,077 shares of common stock, which suggests the extent of their holdings. We also know that immediately prior to the April 1953 exchange of stock for debentures, Bonbright & Co. held 13,000 shares, that D. S. Rutty held 4,901 shares, and that Fannie R. Rutty held 9,373 shares.

the Shields and Halley groups. In addition, these two groups insisted that the Hickok Company purchase an additional block of their stock at the same time that the company purchase the stock from the Wertheim group. The evidence also shows that, as a further condition, these groups and others who held common stock were promised that the plan of recapitalization would take place. It is quite apparent from the evidence that these minority groups were anxious to convert their stockholder status to that of bondholders.

Much of Alan Hickok's testimony with regard to the tactics of the dissident minority refers to the Wertheim group but he explained that his reference to the Wertheim group meant not only the Wertheim group of New York (who received cash for their stock) but also Bonbright and Rutty who had associated themselves with Wertheim in the early criticism of the actions of the board of directors, and other stockholders who had associated themselves with Rutty, such as Sage and Austin, and in addition he referred to other hostile minority stockholders not further identified in the record. The record shows that the Austin, Bonbright, Rutty, and Sage stock interests in the total amount of 38,181 shares were completely exchanged for debentures. In addition, the record shows in the testimony of Raymond Hickok that after the exchange there were no stockholders remaining which he would classify as "recalcitrant stockholders or dissident stockholders."

In November 1952 Alan and Raymond each borrowed $30,000 from the Central Trust Company and each purchased 7,500 shares of common stock from the Shields and Halley groups. Also in November 1952 the Hickok Company purchased 26,168 shares of common stock from these two groups. At this juncture both Alan and Raymond held stock which they did not want as an investment. It was purchased by them with the view in mind of later participating in the contemplated exchange of debentures for stock. We cannot say that at this point the Hickok Company had achieved its business purpose of eliminating the dissident groups and that the plan of recapitalization was unnecessary. The Bonbright group still remained, with 13,000 shares of common stock. We do not know the exact total of the stock held by the Wertheim and the Bonbright groups combined, but some indication of such holdings may be gleaned from the fact that at the annual meeting of stockholders of the Hickok Company in April 1951, representatives of the two groups held proxies for at least 103,077 shares of common stock. Only 71,098 shares of common stock were purchased from the Wertheim group in 1952, and from this it appears that at least 31,979 shares still remained outstanding in the hands of a dissident minority. Clearly, it was necessary to eliminate this remaining group through the exchange of their stock for the Hickok Company's newly issued debenture bonds in April

1953. Also, the demand of the Wertheim group in 1952 that their block of shares should be purchased for cash led to changes of position on the part of the Hickok Company and the Hickok brothers personally. These changes of position were obviously made with the view in mind of ultimately putting into effect the plan of recapitalization. It would be completely unrealistic, we think, to try to separate the actual plan of recapitalization in April 1953 from all the events that went before. We think it is quite clear that the plan of recapitalization of the Hickok Company served a definite business purpose.

Respondent makes a short argument that the recapitalization plan must strengthen "the financial structure of the corporation" before it will be held to be such a reorganization as is contemplated by the statute. No case is cited as authority that this test must be applied. Respondent merely states it is a requirement of all reorganizations and goes on to argue it is lacking here because the debt position of the company was weaker after the exchange. We do not agree that there is a requirement that a statutory reorganization by means of recapitalization must be one that strengthens the financial structure of the corporation. There are often other benefits to be derived from such a reorganization. Neither do we agree that merely because the debt position of a corporation is increased, it necessarily follows that the financial structure of the corporation is weakened.

*Decisions will be entered for the petitioners.*