DONALD E. MEYERS AND SYLVIA R. MEYERS, DECEASED, DONALD E. MEYERS, SUCCESSOR IN INTEREST, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Meyers v. Commissioner
Docket No. 26531-91
United States Tax Court
T.C. Memo 1994-466; 1994 Tax Ct. Memo LEXIS 474; 68 T.C.M. (CCH) 740; September 21, 1994, Filed *474 Decision will be entered for petitioners. For petitioners: Mark Bernsley. For respondent: Robin F. Kaufer. BEGHE
BEGHE
MEMORANDUM FINDINGS OF FACT AND OPINION BEGHE, Judge: Respondent determined a deficiency of $ 429,717 in the Meyerses' 1987 Federal income tax. Respondent also determined that the Meyerses are liable for additions to tax for substantial understatement of tax and negligence in the respective amounts of $ 107,429 and $ 21,486, plus 50 percent of the interest due on the deficiency. Sylvia R. Meyers died in 1992, after the petition in this case was filed, but prior to trial. At trial, respondent orally moved to dismiss as to Sylvia R. Meyers for lack of prosecution. Donald E. Meyers (petitioner) objected, arguing that he, as Sylvia R. Meyers' successor in interest, see Cal. Civ. Proc. Code sec. 377.11 (West Supp. 1994), should be allowed an opportunity to protect his interests in that capacity. On August 17, 1994, we denied respondent's motion to dismiss as to Sylvia R. Meyers, citing and relying on Nordstrom v. Commissioner, 50 T.C. 30, 32 (1968). We stated that it was appropriate to afford Sylvia R. Meyers' successor in interest *475 an opportunity to be heard, and that petitioner "has demonstrated that he has the capacity under Rule 60(c), Tax Court Rules of Practice and Procedure, to be substituted for Mrs. Meyers in this proceeding." See Cal. Civ. Proc. Code sec. 377.31 (West Supp. 1994) ("court shall allow a pending action or proceeding that does not abate to be continued by the decedent's personal representative or, if none, by the decedent's successor in interest"); see also Everett v. Commissioner, T.C. Memo. 1989-124. [1]
The substantive issue for decision in this case is whether petitioner received, but did not report, a constructive dividend of $ 1,016,149 from Freight Distributors, Inc. (FDI), in 1987. [2] For the reasons that follow, we hold that petitioner did not receive any such dividend from FDI in 1987. Accordingly, there is no deficiency in the Meyerses' 1987 Federal income tax, and they are not liable for any additions to *476 tax. FINDINGS OF FACT Some facts have been stipulated, and are so found. The stipulation of facts and attached exhibits are incorporated herein. The Meyerses resided in Palm Desert, California, when the petition in this case was filed. FDI is a California corporation organized by petitioner in 1952. After petitioner had operated FDI for a short time during the early 1950's, he suspended its business activities. In 1964, petitioner revived and reorganized FDI as a freight consolidation company, to operate in combination with Eckdahl Warehouse Co. (Eckdahl), a corporation engaged in freight distribution, whose stock petitioner had previously purchased from his father's estate. In 1981, petitioner developed health problems and began to reduce his business activities. Although petitioner reduced his involvement in FDI's day-to-day *477 operations, he remained president of FDI and Eckdahl until January 1988. In July 1984, petitioner transferred his stock interests in FDI and Eckdahl, of which he had been sole shareholder, to a grantor trust, of which he and Sylvia Meyers were trustees. At or about the same time, petitioner asked his son, Greg Meyers, if he wanted to purchase FDI. Greg Meyers declined, saying that he preferred to focus his efforts on developing his own recently organized trucking company. In late 1984 or 1985, petitioner asked Gary Jaberg, an employee and director of FDI, if he would be interested in acquiring FDI. Mr. Jaberg said he had some interest in doing so, but lacked the necessary funds. Although Mr. Jaberg did have the funds to purchase the operating assets of FDI, a sale of FDI's operating assets would not have been practicable because much of its business was tied to nontransferable contracts with customers. Petitioner and Mr. Jaberg nevertheless continued to discuss Mr. Jaberg's possible purchase of FDI throughout 1985 and 1986. Sometime in 1986, petitioner and his accountant, Richard Dougherty, a partner in the certified public accounting firm of Dougherty & Co., conceived a plan *478 to facilitate the sale of FDI to Mr. Jaberg. Under the plan, petitioner and Mrs. Meyers would organize a holding company, Donsyl, Inc. (Donsyl), and cause the grantor trust to transfer its FDI stock to Donsyl in exchange for Donsyl stock. FDI then would transfer its nonoperating assets to Donsyl as a dividend. After Donsyl had received the dividend, it would sell its FDI stock to Mr. Jaberg for the fair market value, as reduced by the prior dividend distribution to Donsyl. In September 1986, Harry Hathaway, petitioner's attorney, incorporated Donsyl under California law on petitioner's behalf. Soon thereafter, Mr. Hathaway and Mr. Dougherty told petitioner that Donsyl had been incorporated. Messrs. Hathaway and Dougherty also left petitioner with the impression that Donsyl had become the parent corporation of FDI. However, from September 1986 to March 1988, neither Mr. Hathaway, Mr. Dougherty, nor petitioner caused Donsyl to issue a stock certificate to the grantor trust in exchange for the trust's FDI stock. On July 1, 1987, FDI's board of directors held a special meeting and resolved that the company pay a dividend to its shareholder, Donsyl[,] Inc., in the aggregate *479 amount of Four Hundred Thousand Dollars ($ 400,000) and that the funds be paid as they become available from maturing * * * bank certificates of deposit, but in no event later than December 1, 1987.
From June to August 1987, FDI transferred ownership of four $ 100,000 certificates of deposit to Donsyl. Petitioner never had legal title to or control of these certificates of deposit in his individual capacity. On December 15, 1987, FDI's board of directors held another special meeting and declared a second dividend to be paid to Donsyl in an amount equal to FDI's net book value less $ 11,500. The dividend was to be paid as of December 31, 1987, and was composed of petitioner's promissory note to FDI in the amount of $ 399,624.83, an account receivable of $ 152,851.89 due to FDI from petitioner, nine truck tractors leased to Eckdahl, and cash. In June 1988, Mr. Dougherty made accounting entries to the books of FDI and Donsyl to show that, on or before December 30, 1987, FDI had distributed to Donsyl nonoperating assets, which had a fair market value of $ 616,149. The only way in which the distribution was effected was by means of those 1988 book entries. Petitioner never *480 received or had control of those distributed assets in his individual capacity. On December 30, 1987, Donsyl sold FDI to Mr. Jaberg and his wife, Elaine Jaberg, for $ 11,500. [3] Mr. and Mrs. Jaberg did not receive, at the closing, the stock certificate evidencing their ownership of FDI. In January or February 1988, Mr. Jaberg asked petitioner when he was going to receive the stock certificate evidencing his ownership of FDI. Petitioner promptly contacted Mr. Dougherty to inquire about Mr. Jaberg's stock certificate, and Mr. Dougherty then realized for the first time, and so informed petitioner, that the grantor trust and Donsyl had not exchanged stock certificates evidencing Donsyl's ownership of FDI and the grantor trust's ownership of Donsyl. On March 10, 1988, Mr. Dougherty wrote *481 to Mr. Hathaway, describing in detail the stock issuances and transfers needed to carry out the plan conceived by petitioner and him. On March 16, 1988, a stock certificate for 150,000 shares of Donsyl common stock was issued to the grantor trust, in anticipation that not only its FDI stock but also its Eckdahl stock was to be transferred to Donsyl. On April 8, 1988, the stock certificate for 50 shares of FDI common stock previously issued to the grantor trust in 1984, representing all outstanding shares of FDI, was canceled, and another stock certificate for 50 shares of FDI common stock was issued to Donsyl. That stock certificate also was canceled on April 8, 1988, and another stock certificate representing 50 shares of FDI stock was issued to Gary and Elaine Jaberg. The receipt attached to that FDI stock certificate recites that the Jabergs received their FDI stock from Donsyl. At the time of trial, petitioner, through the grantor trust, retained stock ownership and control of Donsyl, and Donsyl owned and operated Eckdahl and a restaurant in Palm Desert, California. OPINION Preliminary Observations
Before addressing the arguments advanced by the parties, we take *482 note of two matters they did not address. We start with the observation, based on our reaction to the entire record, that this is not a case like Gregory v. Helvering, 293 U.S. 465 (1935), or any of its progeny, in which the taxpayer, with professional help, conceived and carried out a scheme to take advantage of the formal provisions of the tax law to achieve a tax result not intended by Congress. Instead, we have a straightforward plan that would have effectively served the corporate business purposes of FDI and petitioner's personal planning purposes, without adverse tax consequences to petitioner, if it had been implemented with professional competence. [4] The question therefore is whether the errors of omission of petitioner's lawyer and his accountant, in their delays in documenting the Donsyl-FDI transactions, resulted in the adverse tax consequences to petitioner that respondent has sought to impose. *483 [5]
We also note that respondent has not argued that the property distributions resulted in a cancellation of petitioner's promissory note and account receivable (or evidenced any lack of intent to enforce them), thereby triggering a realization and recognition of earlier withdrawals of FDI liquid assets as earnings and profits. See generally Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders, par. 8.05[6], at 8-46 (6th ed. 1994). In the absence of any challenge by respondent along these lines, we assume that petitioner's prior obligations to FDI remained valid and subsisting in the hands of Donsyl and that petitioner has continued to make payments on the promissory note in accordance with its terms. The Parties' Contentions
Respondent contends that during 1987 petitioner received, but did not report, a constructive dividend of $ 1,016,149 from FDI. Respondent argues that the Meyerses had not transferred the grantor trust's stock ownership interest in FDI to Donsyl when *484 the distributions at issue were made. Respondent argues that the property distributions to Donsyl were at petitioner's behest, and that the distributions benefited him because they allowed "petitioners to sell their FDI stock to [Mr.] Jaberg." Petitioners contend that petitioner did not receive a constructive dividend from FDI during 1987. Petitioners argue that the distributions to Donsyl cannot be a dividend to petitioner because a dividend is property received by a shareholder, and Donsyl, not the grantor trust, was FDI's sole shareholder when the asset distributions were made. Petitioners argue that, even if the grantor trust had been FDI's shareholder when the distributions were made, petitioner did not receive a constructive dividend as a result of these distributions to Donsyl because (a) Donsyl received the property and was holding it in trust until such time as it actually became FDI's parent, and (b) petitioner did not receive a direct economic benefit from FDI's distributions to Donsyl. In the alternative, petitioners argue that the dividend he received in 1987 was no more than $ 400,000, the amount actually distributed to Donsyl in 1987. Whose Dividend: Petitioner's *485 or Donsyl's?
Section 316(a) [6] provides that "any distribution of property made by a corporation to its shareholders" is a dividend. However, a distribution does not escape taxation as a dividend simply because the shareholder did not personally receive the property. Sammons v. United States, 433 F.2d 728, 730 (5th Cir. 1970); Biltmore Homes, Inc. v. Commissioner, 288 F.2d 336, 340 (4th Cir. 1961), affg. T.C. Memo. 1960-53; see also Sparks Nugget, Inc. v. Commissioner, T.C. Memo. 1970-74, affd. 458 F.2d 631 (9th Cir. 1972). Rather, "it is the power to dispose of income and the exercise of that power that determines whether * * * [a dividend] has been received." Sammons v. United States, supra at 732; see also Helvering v. Horst, 311 U.S. 112 (1940); Clark v. Commissioner, 266 F.2d 698, 713 (9th Cir. 1959), affg. on this issue and remanding T.C. Memo. 1957-129. *486 The parties agree that FDI's distribution of its non-operating assets to Donsyl was a dividend. However, they disagree on whether petitioner was the recipient of that dividend. Although the parties' arguments focus primarily on whether the grantor trust held legal title to FDI when the property distributions to Donsyl were made, we do not rely on the locus of legal title in determining whether a taxpayer is charged with receiving a dividend. [7]Yelencsics v. Commissioner, 74 T.C. 1513, 1527-1529 (1980). *487 For Federal income tax purposes, "record ownership of stock * * * is not determinative of who is required to include any dividends attributable to such stock in gross income." Cordes v. Commissioner, T.C. Memo. 1994-377. A distribution may result in a constructive dividend to the taxpayer even though the taxpayer did not hold legal title to the corporation at the time of the distribution. Yelencsics v. Commissioner, supra at 1527-1529. The relevant inquiry, therefore, is whether the incidents of ownership remained with the taxpayer at the time of distribution. Walker v. Commissioner, 544 F.2d 419, 421-422 (9th Cir. 1976), revg. T.C. Memo. 1972-223; Ragghianti v. Commissioner, 71 T.C. 346, 349 (1978), affd. without published opinion 652 F.2d 65 (9th Cir. 1981); Cepeda v. Commissioner, T.C. Memo. 1994-62. Accordingly, we consider whether the grantor trust retained the benefits and burdens of stock ownership of FDI when the distributions were made. "'Beneficial ownership *488 is marked by command over property or enjoyment of its economic benefits.'" Cordes v. Commissioner, supra (quoting Cepeda v. Commissioner, supra). In regard to command over property, we look to the taxpayer's ability to cause the corporation to pay or advance corporate funds. See id. As to benefit, a distribution does not have to increase a taxpayer's net worth to be an economic benefit to him. Smith v. Commissioner, 70 T.C. 651, 658 (1978). However, a distribution is not an economic benefit to the taxpayer if his enjoyment of it is merely incidental. We rely upon the objective evidence provided by the taxpayer's overt actions to make these determinations. Cepeda v. Commissioner, supra.
The case at hand is unusual because petitioner had indirect control over FDI at all relevant times. The issue, however, is whether, at the times of distribution, petitioner exercised control over FDI through the grantor trust's ownership of Donsyl stock. Although the certificate of stock had not physically been delivered to Donsyl at the times of distribution *489 of the certificates of deposit, the objective evidence in this case compels the conclusion that Donsyl had control of FDI at the times of distribution. After September 1986, documents prepared at the behest of petitioner, including the minutes of purported meetings of the board of directors and resolutions adopted therein, indicate that petitioner understood Donsyl to be the sole shareholder of FDI. Mr. Jaberg testified that on more than one occasion, petitioner told him that he would be purchasing FDI from Donsyl, not the Meyerses or the grantor trust. Moreover, there is no evidence in the record that, after September 1986, petitioner failed to recognize that his command of FDI was limited to his authority as president of FDI and as trustee of Donsyl's shareholder, the grantor trust. Inasmuch as petitioner recognized these corporate formalities and related them to those he had dealings with, we conclude that, at the times of distribution, any control by petitioner over FDI was in his capacity as trustee of Donsyl's shareholder, the grantor trust. Petitioner also did not directly benefit from the property distributions. The directors of FDI understood that Donsyl was the sole *490 shareholder of FDI at the times of distribution, and their resolutions authorizing the payment of a dividend explicitly provided that the payment be made to "its shareholder, Donsyl[,] Inc." The dividend was paid directly to Donsyl, and petitioner was never entitled to that payment individually or in his capacity as trustee of the grantor trust. Cf. Cukor v. Commissioner, T.C. Memo. 1968-17. Respondent's argument that petitioner benefited from the asset distributions through his sale of FDI to the Jabergs is misplaced. The evidence in this case shows that Donsyl was the primary beneficiary of the sale of FDI to the Jabergs. It is undisputed that the stock purchase agreement was between Donsyl and the Jabergs, that the Jabergs paid Donsyl for the FDI stock, that Donsyl retained the sales proceeds in corporate solution, and that the Jabergs received from Donsyl their FDI stock certificate promptly following cancellation of the certificate of Donsyl's ownership of the FDI stock. Thus, any distribution that facilitated the sale of FDI to the Jabergs primarily benefited Donsyl, and any benefit that accrued to petitioner from the sale of FDI was an indirect *491 benefit derived from his ownership of Donsyl stock. The property distributions also did not lead to other benefits that sometimes accrue to a shareholder. For example, the distributions were not undertaken (1) to reduce petitioner's indebtedness to Donsyl, see Tabery v. Commissioner, T.C. Memo. 1964-189, affd. 354 F.2d 422 (9th Cir. 1965), (2) to help Donsyl meet its obligations without the need of additional contributions from petitioner, see Sparks Nugget, Inc. v. Commissioner, T.C. Memo. 1970-74, or (3) to legitimize the tax avoidance purposes of an integrated transaction having no corporate business purpose, see Kuper v. Commissioner, 533 F.2d 152, 161-162 (5th Cir. 1976), revg. on this issue 61 T.C. 624 (1974). Accordingly, petitioner, in his individual capacity, did not have command over FDI or enjoyment of its economic benefits, including the dividends at issue at the times of distribution. Petitioner therefore did not have beneficial ownership of the FDI stock at the times it made its dividend distributions, and thus those distributions *492 are not dividends to him. To reflect the foregoing, Decision will be entered for petitioners. Footnotes
1. We have granted respondent's motion to change the caption in this case.↩
2. Respondent initially determined that the Meyerses received dividend income of $ 1,116,149 from FDI in 1987, but concedes that FDI did not distribute $ 100,000 of that amount during 1987.↩
3. Although Mr. Jaberg testified that the sale of FDI was effective Jan. 1, 1988, the purchase agreement states that closing was to occur on Dec. 30, 1987. This discrepancy is not material for purposes of deciding the issue before us.↩
4. Mr. Dougherty's plan to strip FDI of its nonoperating assets facilitated the sale of FDI stock to an employee who would continue its business when Mr. Meyers was no longer willing or able to do so. The plan is a variation of a time-honored planning approach to revitalize a corporate business under new shareholder management, a technique that is recognized as having a corporate business purpose. See Gallagher v. Commissioner, 39 T.C. 144, 162 (1962); Dean v. Commissioner, 10 T.C. 19 (1948); Hartzel v. Commissioner, 40 B.T.A. 492↩ (1939).
5. See generally Lyon, "Tax Blunders: Treasury Should Reduce Their Cost", 45 Taxes 575↩ (1967).
6. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for 1987.↩
7. We note that our conclusion would not be changed even if we relied on the locus of legal title. Under California law, a grant, which includes the transfer of stock, see Kirkpatrick v. Tapo Oil Co., 301 P.2d 274, 281 (Cal. Dist. Ct. App. 1956), takes effect upon delivery by the grantor. Cal. Civ. Code sec. 1054 (West 1982). However, physical delivery of the certificates is not necessary in all cases to effect the transfer of legal title to shares of stock. Robbins v. Pacific Eastern Corp., 65 P.2d 42, 59 (Cal. 1937); Kirkpatrick v. Tapo Oil Co., supra at 281; see also Tabery v. Commissioner, T.C. Memo. 1964-189, affd. 354 F.2d 422 (9th Cir. 1965). Rather, legal title to the shares is deemed to have been transferred when the certificate is understood to have been delivered and the grantee is entitled to immediate delivery. Cal. Civ. Code sec. 1059 (West 1982). In the case at hand, petitioner, a cotrustee of the grantor trust and an officer of Donsyl, understood that the grantor trust had transferred its stock in FDI to Donsyl prior to the times of distribution. Although the stock certificates had not been physically delivered at the times of distribution of the certificates of deposit, the evidence shows that Donsyl was entitled to immediate delivery of the stock. Thus, the certificates of stock were constructively delivered to Donsyl before the first distribution at issue was made. Accordingly, Donsyl held legal title to FDI when the distributions at issue were made.↩