Estate of Cordie Hawthorne, Deceased, E. P. Ross, Independent Executor, and Herb J. Hawthorne, et al. [1] v. Commissioner. Estate of Hawthorne v. Commissioner
Docket Nos. 59927, 59980, 75170, 75171.
United States Tax Court
T.C. Memo 1960-146; 1960 Tax Ct. Memo LEXIS 150; 19 T.C.M. (CCH) 770; T.C.M. (RIA) 60146; June 30, 1960
John G. Heard, Esq., for the petitioners. D. Louis Bergeron, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: In these consolidated proceedings respondent determined the following deficiencies: Additions
to tax,
Sec.
Income tax
294(d)(2),
Petitioner
Year
deficiency
I.R.C. 1939
Estate of Cordie Hawthorne, Deceased, E. P.
1951
$48,109.77
$3,425.10
Ross, Inde-
pendent Executor, and Herb J. Hawthorne (Docket
1952
89,650.14
5,379.00
No.
59927)
Earl M. Weaver and Tudor T. Weaver (Docket No.
1951
975.74
59980)
1952
16,682.29
Herb J. Hawthorne and Estate of Cordie
1953
96,326.55
Hawthorne, De-
ceased, E. P. Ross, Independent Executor (Docket
No.
75170)
Earl M. Weaver and Tudor T. Weaver (Docket No.
1953
22,770.80
75171)
*151 The issues are: (1) Whether payments to petitioners Herb J. Hawthorne, hereinafter called Hawthorne, (1951 through 1953) and Earl M. Weaver, hereinafter called Weaver, (1952 and 1953), under an exclusive licensing agreement, are taxable as long-term capital gains or as ordinary income; and (2) whether, in 1952 and 1953, notes received by a church from a corporation, a purchaser of certain of its assets, and endorsed to petitioners Hawthorne and Weaver, in payment for their sale of certain stock to the church, constitute part of the purchase price of such stock and are taxable as long-term capital gains on an installment method of accounting or are taxable to petitioners as ordinary income. Petitioners in all docket numbers concede that, if they are successful under Issue No. 2, the computations for the sale of such stock as reflected on their respective returns for the years in issue were erroneous and should be recomputed under Rule 50. Petitioners in Docket Nos. 75170 and 75171 concede the disallowance of partnership losses. Petitioners in Docket No. 59927 concede that the additions to tax, if any, will depend on the disposition of other issues and may be computed under Rule *152 50. Findings of Fact Some of the facts were stipulated and are hereby found. Herb J. Hawthorne and his wife, Cordie, resided in Houston, Texas and filed joint returns on a cash method of accounting with the collector (or director) of internal revenue for the first collection district of Texas from 1949 through 1953, respectively. Cordie Hawthorne died on January 21, 1957 and E. P. Ross is the duly appointed and qualified independent executor of her estate. Hawthorne and his wife will sometimes hereinafter be called the Hawthornes. Earl M. Weaver and his wife, Tudor T., resided in Houston, Texas and filed joint returns on a cash method of accounting with the collector (or director) of internal revenue for the first collection district of Texas from 1951 through 1953, respectively. Weaver and his wife will sometimes hereinafter be called the Weavers. Edward Price Ross, hereinafter called Ross, has been a public accountant since June or July of 1929. He is a tax consultant and has been associated with various attorneys concerning tax problems. As a member of the firm of Davidson, Ross & Co., Ross personally prepared the joint income tax returns, and separate gift tax returns *153 in 1952, of the Hawthornes; the joint income tax returns of the Weavers; and the corporate income tax returns of Herb J. Hawthorne, Inc., a Texas corporation, hereinafter called Texas, and Herb J. Hawthorne, Inc., a Delaware corporation, hereinafter called Delaware. R. M. Thornton, Jr., hereinafter called Thornton, has been engaged in a general practice of law in Houston, Texas for approximately 28 years. He is not a tax specialist. Since 1948, Thornton represented Hawthorne, Weaver, Texas and Delaware. Weaver received a bachelor of science degree in electrical engineering in 1935. At all material times he was a registered engineer. From 1935 through the middle of January 1948, Weaver worked for Gray Tool Company. His last position with Gray Tool Company was chief engineer. Commencing with 1948, Weaver was an employee of Texas and Delaware (which were engaged in the manufacture of drill bits) for approximately 10 years in the aggregate. Originally Hawthorne lived in Conroe, Texas and was associated with the Hawthorne Bit & Tool Company, a Texas corporation, in the ownership and development of various patents of which he was the inventor. On March 11, 1933, Hawthorne filed Application *154 Serial No. 660,411 for a patent on an invention. This application was granted on July 25, 1933, resulting in the issuance of Patent No. 1,919,553. This patent was titled "Detachable Blade Drag Bit." On January 27, 1937, Hawthorne assigned Patent No. 1,919,553 to the Hawthorne Bit & Tool Company. On February 10, 1937, this assignment was recorded in the United States Patent Office. Prior to 1948, the corporation distributed Patent No. 1,919,553 to Hawthorne in dissolution. On April 12, 1938, Hawthorne filed Application Serial No. 201,584 for a patent on an invention. This application was granted on February 25, 1941, resulting in the issuance of Patent No. 2,233,260. This patent was titled "Means and Method of Drilling Wells." On May 12, 1938, Hawthorne and another filed Application Serial No. 207,588 for a patent on an invention. This application was granted on December 10, 1940, resulting in the issuance of Patent No. 2,224,345. The patent was titled "Fluid Separator." On August 24, 1945, Hawthorne filed Application Serial No. 612,416 (Patent Docket No. 2,469) for a patent on a detachable blade bit which he had invented. This application was granted on October 28, 1952, resulting *155 in the issuance of Patent No. 2,615,684. This patent was titled "Detachable Blade Bit" and stated, in part: "The invention relates to a detachable blade bit generally known in the well drilling art as a drag bit. With drag bit construction the blade portions wear rapidly by abrasion against the earth formations and it is desirable to replace the blades while retaining or salvaging the body and other portions of the bit. Great difficulty is encountered, however, in securely affixing the blades to the bit body so as to avoid loosening of the blades due to the chattering of the bit. "It is not uncommon to conduct the drilling operation in the rotary method of drilling wells by applying weights approximately ten, twenty or even thirty thousand pounds to the drill bit by lowering the weight of the drill stem or operating pipe onto the bit. When it is considered that the bit may be rotated at fifty to one hundred revolutions per minute while having a tremendous weight of this sort applied to it, it seems obvious that the bit is chattering against the formation. This chatter action tends to loosen all previous types of detachable blade bits with which I am familiar, and the present invention *156 therefore contemplates a particular arrangement of the structure whereby the blades are securely wedged in position and retained against loosening while under use under the most exacting conditions. "It is therefore one of the objects of the invention to provide a detachable blade bit assembly wherein a plurality of blades are applied to a body structure retained in position with a wedge member and the wedge member in turn wedged against the blade by a retainer collar. * * *
"Broadly, the invention contemplates a detachable blade bit where the blades are secured by a wedging action in position upon the bit body by a clamping collar. In this manner the direct thrust of the rotative force of the drill stem and drill collar against the clamping collar is transmitted to the blades and bit body by the clamping collar so that a rigid securing means is provided." On December 29, 1947, Hawthorne filed Application Serial No. 794,239 (Patent Docket No. 2,865) for a patent on a detachable blade bit which he had invented. This application was granted on January 19, 1954, resulting in the issuance of Patent No. 2,666,622. This patent was titled "Detachable Blade Bit" and stated, in part: *157 "The invention relates to a detachable blade bit and is an improvement over my prior co-pending application, Serial No. 612,416 filed August 24, 1945, now Patent 2,615,684." On January 13, 1949, Hawthorne filed Application Serial No. 70,622 for a patent on a finger blade drag bit which he had invented. As of April 28, 1959, this application was still pending. Hawthorne filed other applications for patents which were subsequently granted as follows: Application
Date of
Patent num-
Date
Serial No.
application
ber issued
patent granted
Title of patent
794,239 *
12/29/47
2,859,942
11/11/58
Detachable blade bit.
130,192 **
11/30/49
2,695.158
11/23/54
Fracture type roc cutter.
130,191 ***
11/30/49
2,831,657
4/22/58
Removable blade drag bits.
211,957 **
2/20/51
2,783,973
3/ 5/57
Drill bit. The patents granted on these applications were improvements to Patent Nos. 2,615,684 and 2,666,622. The bits disclosed in all these patents, including Patent Nos. 2,615,684 and 2,666,622, *158 were different from those disclosed in Patent Nos. 1,919,553; 2,233,260; and 2,224,345. On February 4, 1948, Texas was organized and incorporated, with its principal office and place of business in Houston, Texas. The incorporators and the positions held by each were as follows: Name of
incorporator
Position
Hawthorne
Director-President
Weaver
Director-Vice President,
Treasurer
Thornton
Director-Secretary
Hawthorne and Weaver, respectively, owned 75 per cent and 25 per cent of Texas' authorized capital stock of $20,000 (consisting of 2,000 shares at $10 par value) as follows: Amount
Payment
Payment
Stock certifi-
Shareholder
of subscription
by cash
by assets
cate No. issued
Hawthorne
$10,000
$10,000
1
Hawthorne
5,000
$5,000
2
Weaver
5,000
5,000
3
On February 4, 1948, Hawthorne, Weaver and Thornton attended and participated in the first meeting of Texas' board of directors. Thornton prepared the minutes of this meeting, which stated in part: "It was decided by the directors that the inventory of material on hand owned by * * * Hawthorne and * * * Weaver which was submitted in detail be purchased by *159 the corporation for $10,277.50 which should be paid for by issuing stock for $5,000.00 each to * * * Hawthorne and * * * Weaver and the balance of $277.50 to be paid in cash. It was decided that the corporation should purchase the shop equipment for $1,500.00, the office equipment for $480.00, two Oldsmobile coupes for $4,000.00, the patents owned by * * * Hawthorne and all patterns and dies used in connection therewith for $6,814.00 and the pending application for patent #612416 and the patterns and dies used in connection therewith for $8,500.00, a total of $21,294.00. All the material, equipment and patents were delivered to said corporation and received by it. It was agreed that * * * Hawthorne would accept the corporation's promissory note dated February 4, 1948, due on or before five (5) years after date and bearing interest at the rate of four per cent per annum in the sum of $21,000.00 and the balance of $294.00 in cash in payment of the above items, and the president was authorized to execute and deliver said note in behalf of the corporation. "There being no further business, the meeting was adjourned." At this time, Hawthorne did not sell Application Serial No. 612,416 *160 to Texas. The clause "the corporation should purchase * * * the pending application for patent #612416 and the patterns and dies used in connection therewith for $8,500" was an incorrect statement in the minutes. Hawthorne sold to Texas only the patterns and dies used in connection with Application Serial No. 612,416. The price of $8,500 represented the purchase of approximately 6 dies which cost between $1,000 and $2,000. On January 31, 1949, the directors of Texas, acting pursuant to a unanimous stockholder's resolution of January 25, 1949, amended the charter of Texas, as follows: Amended Article VI "The number of shares of the total [authorized] capital stock of this corporation is 25,000, all without nominal or par value and all of one class, viz., common stock. Two thousand shares (2,000) shall be exchanged for the existing 2,000 shares of the old stock, and 7,200 shares shall be issued to represent the surplus in the corporation reflected by the books to have a value of $72,000.00; and all of said stock so issued shall be fully paid and shall not be liable for any future call or assessment thereon, nor shall the subscribers thereto and the holders thereof be liable *161 for any further payment. The remaining 15,800 shares of common stock without nominal or par value shall be disposed of by the corporation, acting by and through its board of directors and in the manner authorized by the stockholders, and any and all such shares of common stock without nominal or par value so issued and disposed of shall be fully paid stock and not liable to any future call or assessment thereon, nor shall the subscribers therefor or the holders thereof be liable for any future payments thereon." The effective date of this amendment was February 24, 1949. On February 26, 1949, Texas issued the following certificates of stock in accordance with the amended charter: Old certificate
New
number
certificate
Stockholder
(cancelled)
number
Old shares
New shares
New amount
Hawthorne
1, 2
4
1,500
6,900
$69,000
Weaver
3
5
500
2,300
23,000
Totals
2,000
9,200
$92,000
On February 1, 1949, Hawthorne, as Licensor, and Texas, as Licensee, entered into the following exclusive licensing agreement: "WHEREAS, the Licensor hereby warrants and represents as a condition for the obligations of Licensee hereunder that he has *162 invented certain new and useful tools used in drilling wells for which applications for letters patent of the United States were filed as follows: Docket No. 2469 filed August 24, 1945 [Application Serial No. 612,416], covering a detachable blade drilling bit; Docket No. 2865 filed December 29, * * * [1947] [Application Serial No. 794,239], covering a variation and improvement on said detachable blade drilling bit; and Docket No. 2944 filed January 13, 1949 [Application Serial No. 70,622], covering a finger blade drag bit; and said Licensor is the owner of the entire right, title and interest in and to the said applications and the inventions thereof, and that no license or right such as to be in conflict with the provisions hereof has heretofore been granted or agreed to be granted; and "WHEREAS, Licensee desires to obtain a license to make, use and sell devices embodying and made in accordance with or by the use of the inventions covered by said applications and letters patents to be issued thereon; "NOW THEREFORE, * * * the parties have agreed together as follows: "1. The Licensor hereby grants to the Licensee an exclusive license, together with the right to grant *163 sublicenses, to make, use, sell and/or rent throughout the United States, its territories and possessions, and in all foreign countries, under patents and all other letters patents now or hereafter granted within the life of this agreement, owned, controlled or subject to licensing by the Licensor upon any subject matter of the above-identified application, or any improvements thereon, and to employ in its manufacture thereunder the invention or inventions of such applications and letters patents covering procedure or apparatus useful in such manufacture, as shall be owned, controlled, or subject to licensing by the Licensor. "2. Licensee agrees that during the life of this agreement it will pay to the Licensor or his assigns a royalty of twelve and one-half per cent (12 1/2%) of the gross sales price of all bits manufactured hereunder. Said royalty shall be computed on the monthly billings, and Licensee agrees to furnish Licensor with copies of all billings currently as billed. "3. Settlement and payment of the royalties hereunder shall be monthly not later than the 20th of the month following the month in which the collection is made * * * "In order to encourage the development *164 and exploitation of the tools manufactured hereunder, the cash consideration for this license will be in lieu of the royalty above provided for, for the first year of operation, and the royalty shall become payable on all business done on and after February 1, 1949. "4. Licensee hereby agrees that it will not manufacture, use, sell or rent any tool in competition with the above referred to drilling and drag bits during the life of this agreement, and further agrees that any improvement developed by it or its agents or employees controlled by the Licensee shall be the property of the Licensor. Licensor agrees that this agreement shall cover and include any and all changes and improvements to the existing tools made or acquired by him. "5. If by reason of its operating under the license herein granted, Licensee or any of its sublicensees or any customer of any of them shall be sued for infringement of any letters patents not owned by Licensor, Licensee shall have the right to reimburse the expense of defending such suit or suits and to pay all profits or damages assessed therein from royalties which otherwise would be payable hereunder. "6. Licensee shall have the right initially *165 at its own expense to bring and prosecute suits against apparent infringers of any letters patent included in the license herein granted and to reimburse the expense thereof from royalties which otherwise would be payable hereunder, and Licensor agrees that Licensee shall have the right to use his name as party plaintiff in any such suit or suits, and agrees to sign all papers and perform all acts necessary or desirable to carry out the intent hereof, and all patent infringement suits brought by or against the Licensee, or its sublicensees, and pertaining to subject matter hereof, shall be promptly reported to the Licensor. "7. Licensee shall have the right to terminate this agreement as to any letters patent included hereunder at any time by giving sixty days written notice mailed to Licensor at his last known home address, or otherwise delivered to him, without, unless so specified by Licensee, terminating it as to other letters patents included in the license herein granted, and the agreement and the license herein granted shall automatically terminate upon the expiration of all letters patents included hereunder, and/or upon the abandonment of any application included hereunder. *166 Licensee hereby agrees that it will prosecute the manufacture, use and sale of said tools in a businesslike manner and in keeping with the needs of the industry in which they are used. "This agreement shall be effective as of February 1, 1948. WITNESS OUR HANDS this first day of February, 1948." Weaver, on behalf of Texas, and Hawthorne signed this agreement which was attested by Thornton. The 12 1/2 per cent royalty specified in the exclusive licensing agreement was the customary royalty paid in the trade. In the spring of 1951 and prior to October 31, 1951, Hawthrne and Weaver discussed with Thornton and Ross, their attorney and accountant, respectively, their tax situation and the possibility of a sale of their Texas stock or of the entire Texas business. It was suggested that they sell the stock or the business to a tax-exempt organization which could pay more than a taxable organization. At this time Hawthorne was a Seventh Day Adventist and Weaver was a Methodist. Thornton, an Episcopalian, initially approached Bishop Quin of the Protestant Episcopal Church of the Diocese of Texas, hereinafter called the church, on behalf of Hawthorne and Weaver. Shortly thereafter, Bishop *167 Quin contacted S. S. McClendon, Jr., hereinafter called McClendon, with respect to the purchase of the Texas stock. McClendon, a practicing attorney since 1919, was the chancellor and legal officer of the church. He suggested that Bishop Quin appoint nominal trustees who would take title to the stock for the church, since the church was not a legal entity, and since the dissolution of Texas and the church's management or sale of the liquidated assets was contemplated. McClendon and Bishop Quin did not want to undertake steps in the Bishop's name which would involve some business activity. Sometime in 1951, Bishop Quin appointed the following individuals as nominal trustees for the church: T. D. McGown, an attorney and former assistant chancellor of the church; H. T. Tellepsen, a general contractor; and J. W. Kilpatrick, an executive of an insurance firm. All three individuals, sometimes hereinafter called collectively the trustees, were Episcopalians. The trustees were nominal trustees and had no independent authority to act. Bishop Quin was the primary authority and the trustees acted for the church at his direction. Bishop Quin participated directly in the majority of the trustees' *168 meetings. On October 31, 1951, Hawthorne and Weaver, as sellers, entered into an agreement with the trustees for the church, as purchasers, for the sale of their respective stock in Texas. This agreement, sometimes hereinafter called the Texas stock sale agreement, was as follows: "1. Sellers hereby agree to sell and purchasers agree to purchase all of the capital stock of * * * [Texas] upon the following terms and conditions: "(a). The sale price shall be * * * [$3,000,000.00] payable in minimum annual installments of not less than an amount equal to ten per cent (10%) of the net sales of the corporation, its successors or assigns. Net sales as used herein shall mean gross sales less merchandise returns and allowances. "(b). There shall be no obligation on the purchasers to pay any amount or amounts hereunder except that they shall * * * pay to the sellers the minimum annual installments set out above, such payments to be made on an annual basis and be payable on or before the expiration of sixty (60) days from the close of business each year, or such payments may at the option of sellers on 15 days notice be payable quarterly; if such option is exercised then the payments *169 shall become due and payable on or before sixty (60) days after the close of business each quarter. But in no event shall the purchasers herein be required to pay to the sellers more money in any given calendar year than is received by them from * * * Texas, its successors and assigns. Any installments not paid when due shall bear interest at the rate of 3% per annum from due date until paid. "(c). The purchasers agree (and the right is hereby granted) that should the form of operating the business be changed, that they will at all times pertinent hereunder keep and maintain such records and accounts as may be deemed necessary and desirable to fully account to the sellers for the operations of the business. "(d). As part of the consideration for the purchase herein purchasers agree to execute a Demand Note payable to Sellers for an amount equal to the current assets less the current liabilities of * * * [Texas]. Such note to be delivered to Sellers as soon as the figures as at October 31, 1951 are available. "2. The purchasers agree to execute all necessary mortgages, liens, notes or other indication of debt necessary to secure the payments to the sellers either directly or *170 to cause them to be executed and delivered by the successors or assigns to fully pledge the assets of the corporation as presently owned and to the end that all of the assets of the enterprise shall secure the performance of this contract, except that no mortgage or lien shall be given that will in any manner hamper or interfere with the normal course of business." On November 27, 1951, Ross advised the trustees for the church that Texas' net current assets (current assets less current liabilities) as of October 31, 1951 amounted to $128,617.72. Weaver and Sidney Sherwood assisted Ross in computing this amount. Under date of October 31, 1951, the trustees for the church executed a demand note payable to Hawthorne and Weaver in the amount of $128,617.72, with 3 per cent annual interest, and delivered it to them. This note was issued pursuant to paragraph 1(d) of the Texas stock sale agreement and was paid in full. On October 31, 1951, Hawthorne and Weaver endorsed and delivered their respective Texas stock certificates (Nos. 4 and 5) to the trustees for the church pursuant to the Texas stock sale agreement. After computing the necessary amounts, Ross affixed United States Documentary *171 Stamps to the two stock certificates and, under date of October 31, 1951, cancelled these stamps. From February 4, 1948 to October 31, 1951, Hawthorne and Weaver owned all of Texas' stock. On and after October 31, 1951, McClendon advised Bishop Quin to have the directors and officers of Texas operate Texas until it was finally decided what to do with the business. Thornton and Ross suggested that the trustees for the church sell the Texas business to a new corporation which they would organize. On November 13, 1951, Delaware was organized and incorporated under the laws of Delaware. Its certificate of incorporation, as amended on November 27, 1951, provided in part: "FOURTH: The total number of shares of stock which the corporation shall have authority to issue is * * * [2,000] and the par value of each of such shares is * * * [$1.00] amounting in the aggregate to * * * [$2,000]. * * *
"FIFTH: The minimum amount of capital with which the corporation will commence business is * * * [$1,000]." Ross and Thornton were each issued 500 shares of Delaware's capital stock at $1.00 per share. At any material time none of the Delaware stock was owned by Hawthorne and *172 Weaver. Neither had an agreement to acquire such stock. On December 20, 1951, the trustees for the church, as stockholders of Texas, unanimously consented to the dissolution of Texas from and after the date of filing a certificate with the Secretary of State of Texas. Hawthorne, Weaver and Thornton, as officers and directors of Texas, certified the stockholders' consent. They certified themselves as officers and directors of Texas and certified as other officers the following: Ross, assistant secretary; Murle J. Hawthorne, assistant treasurer; Burle C. Hawthorne, assistant secretary. The dissolution papers were filed and approved in the office of the secretary of state under date of December 21, 1951. On December 20, 1951, Hawthorne, Weaver and Thornton, as trustees in liquidation of Texas, conveyed to the trustees for the church the premises, land and building previously owned by Texas and made a blanket assignment to the trustees for the church of all assets previously owned by Texas. On December 20, 1951, the trustees for the church, as sellers, and Delaware, as purchaser, entered into the following sales agreement: * * *
"1. * * * [Trustees] agree to sell and * * *173 * [Delaware] [agrees] to purchase the real and personal property as set out and described in Exhibit A, attached hereto, upon the following terms and conditions: "(a). The assumption and agreement to pay by * * * [Delaware] of that certain promissory note, dated October 31, 1951, payable on demand executed by * * * [Trustees] and payable to * * * Hawthorne and * * * Weaver in the principal sum of $128,617.72. "(b). The execution and delivery by * * * [Delaware] of its promissory note payable to * * * [Trustees] on or before four (4) years from date bearing interest at the rate of 3% per annum payable annually in the principal sum of $48,712.82. "(c). It is understood and agreed that the property transferred by * * * [Trustees] to * * * [Delaware] is subject to that certain agreement dated October 31, 1951, between * * * Hawthorne and * * * Weaver and * * * [Trustees,] and * * * [Delaware] accepts the property subject to the obligations of said agreement. "(d). * * * [Trustees] agree that they will assign to * * * [Delaware] all of their right, title and interest in that certain Licensing Agreement, dated February 1, 1948, [executed February 1, 1949] *174 between * * * Hawthorne and * * * Texas * * * and * * * [Delaware] agrees to comply with and assume full responsibility for the further performance of the obligations of said Licensing Agreement, and * * * [Delaware] further agrees that * * * [it] will pay to * * * [Trustees,] in addition to the royalty provided for in said [Licensing] Agreement, a royalty of 20% of the net sales of all products manufactured, used, sold and/or rented exclusive of assemblies under said Licensing Agreement. Net sales as used herein shall mean Gross Sales, less merchandise returns and allowances. "(e). * * * [Delaware] hereby [assumes] all of the obligations and liabilities, including taxes, of * * * Texas * * * at the time of its dissolution. "2. * * * [Trustees] agree to execute all instruments necessary to carry out the above agreement." EXHIBIT "A"
Land and improvements * * *: A tract of land facing 151 feet on
Cross Timbers Road * * *
$14,770.00
One-story factory type building * * *
10,387.00
Small steel building * * *
864.00
Total value of land and improve-
ments
$26,021.00
Other fixed assets * * *: Automobiles, trucks and trailers
$ 9,196.29
Stock room and shipping equipment
113.97
Shop equipment
10,573.70
Miscellaneous equipment
404.28
Office equipment
2,403.58
Total - at depreciated cost
$22,691.82
Total fixed assets
$48,712.82
*175 Pursuant to the December 20, 1951 sales agreement, the trustees for the church, under date of December 19, 1951, conveyed to Delaware certain property, retaining a vendor's lien thereon, and made a blanket assignment to Delaware of all the assets received as a liquidating distribution from Texas. On December 20, 1951, Delaware executed a 4-year promissory note in the amount of $48,712.82, bearing 3 per cent annual interest payable to the trustees for the church. On April 13, 1953, the trustees for the church acknowledged the payment of this note and released the vendor's lien. On December 20, 1951, the trustees for the church assigned to Delaware the exclusive license agreement of February 1, 1949. This assignment was pursuant to the December 20, 1951 sales agreement between the same parties and provided, in part: "WHEREAS, * * * [Texas] on February 1, 1948 [1949] entered into an agreement with * * * Hawthorne under which the former acquired from the latter an exclusive license to make, use, sell and/or rent devices embodying and made in accordance with the inventions on which the following applications for Letters Patent of the United States have been filed, together with *176 all improvements [thereon:] "Docket 2469 filed August 24, 1945 covering a Detachable Blade Drilling [Bit;] "Docket 2865 filed December 29, 1945 covering a Variation and Improvement on said Detachable Blade Drilling [Bit;] "Docket 2944 filed January 13, 1949 covering a Finger Blade Drag Bit. "WHEREAS, * * * [Texas] through liquidation, assigned, transferred and conveyed the said license to Trustees, and all rights thereto are now owned by Trustees; and "NOW, THEREFORE, in consideration of the mutual covenants herein contained the parties hereto have agreed as follows: 1. "Trustees hereby assign, transfer and convey to * * * [Delaware] the said license and all of their rights thereunder subject to the following agreements: 2. "* * * [Delaware] hereby accepts said license and agrees to comply with all of the terms and conditions of the said license agreement and the additional conditions contained herein. 3. "The Trustees and each of them, and the * * * [Church] are hereby released and forever discharged of and from all claims, demands and causes of action, at law or in equity, which against any of them, Hawthorne or * * * [Delaware], their legal *177 representatives or assigns can, shall or may have for or by reason of anything any of the said Trustees or the * * * [Church] has done or has failed to do with reference to the subject matter of any transaction or occurence [occurrence]. 4. "* * * [Delaware] agrees that it will pay to * * * Hawthorne the 12 1/2% royalty provided for in the original licensing agreement dated February 1, 1948 [executed February 1, 1949] between * * * Hawthorne and * * * [Texas]. "* * * [Delaware] agrees that it will pay to Trustees a royalty, in addition to the royalty payable to Hawthorne, of 20% of net sales of products manufactured, used, sold and/or rented exclusive of assemblies under the licensing agreement herein assigned. Net sales as used herein shall mean gross sales, less merchandise returns and allowances. Such royalty shall be computed on the monthly billings but shall be payable annually and shall become due 60 days after the close of business each year. However, Trustees may elect after five days' notice to receive payment of 10% on a quarterly basis and if they so elect such payments shall become due 60 days after the close of each quarter. Any payments not paid when *178 due shall bear interest at 3% per annum from due date until paid. "* * * [Delaware] agrees that the above royalties shall be payable for the life of any and all patents issued under the applications above referred to or as same may be amended or supplemented covering the inventions described or improvements thereon, or that may come under either this agreement or the original agreement dated February 1, 1948 above referred to; and further agree that should no patents issue hereunder or should all patents issued expire then and in that event * * * [Delaware] will pay to the Trustees a royalty of 12 1/2% of net sales so long as * * * [Delaware] continues to manufacture, use [and]/or sell bits which are presently contemplated hereunder. "* * * [Delaware] agrees that they will at all times pertinent hereunder keep and maintain such records and accounts as may be deemed necessary and desirable to fully account to Trustees for the operations of the business and to furnish statements showing the business done as required by Trustees. * * *
"The Trustees shall be under no oblitigation or duty and shall have no authority to cause * * * [Delaware] to manufacture, use or *179 sell anything, or to otherwise direct the activities of * * * [Delaware] and shall in no event be liable by reason of any patent infringement committed by * * * [Delaware] or by reason of anything * * * [Delaware] may do, or fail to do. "None of the Trustees shall in any event be liable except for an act committed by him in bad faith, or his failure to account to the * * * [Church] for money received. "The * * * [Church] shall not be liable under any circumstances." * * *
In a letter dated December 29, 1951, Hawthorne wrote Delaware as follows: "This letter is to confirm my consent to the assignment to you of that certain licensing agreement, dated February 1, 1948, [executed February 1, 1949] between myself and * * * [Texas], covering certain applications for Letters Patent covering a detachable Blade Bit and Bit Assembly fully described in said agreement." On December 24, 1951, the Secretary of State of Texas granted Delaware a permit to transact business in Texas for a period of 10 years. Delaware delayed the receipt of such permit because the purchase of the Texas assets from the trustees for the church was uncertain. Under date of December 27, 1951, the *180 trustees in liquidation of Texas filed with respondent Form 966 "Return of Information Under Section 148(d) Of The Internal Revenue Code To Be Filed By Corporations Within 30 Days After Adoption Of Resolution Or Plan Of Dissolution, Or Complete Or Partial Liquidation." This form was executed as follows: "* * * [Texas] (Dissolved) "By: * * * Hawthorne, President and Director "By: * * * Thornton, * * *, Director "By: * * * Weaver, Director "Being the President and all of the Directors at date of the dissolution of such dissolved corporation, and constituting the Trustees in Liquidation thereof." On March 1, 1952, Hawthorne assigned to Weaver as a gift an undivided 1/4 interest in patent Application Serial Numbers 612,416 (filed August 24, 1945) and 794,239 (filed December 29, 1947). In addition, the assignment provided: * * * [This] assignment covers the same interest in any outstanding licensees [licensee] and shall participate in any payments which may become due under said agreements on and after the first day of March, 1952." This was a gift of the community property of Hawthorne and his wife. Each filed separate gift tax returns for 1952 and valued this gift *181 in the amount of $100,000, onehalf of which was reported. Sometime thereafter, one of respondent's agents examined these returns and, on August 8, 1955, determined deficiencies in gift tax after increasing the value of the gift to Weaver from $100,000 to $150,000. Hawthorne and his wife agreed to this adjustment. On October 25, 1957, the gift to Weaver was recorded in the United States Patent Office. Texas' returns for fiscal 1949 and 1950 reported compensation to officers Hawthorne nad Weaver, as follows: Name of officer
Fiscal 1949
Fiscal 1950
Hawthorne
$20,000
$18,000
Weaver
12,000
12,000 The return for fiscal 1950 reported $9,000 of compensation to both Burle C. Hawthorne and Murle J. Hawthorne, assistant secretaries. On the first page of Texas' returns for fiscal 1949 and 1950 appear the stamp notations "Not Investigated" and "Accepted." Texas' final return for fiscal year ending December 21, 1951 was executed by its three officers and directors who were the statutory trustees in liquidation. This return reported the following schedule and explanation for compensation of officers (in even dollars) Time de-
Amount
Name of officer
voted to
Stock
of com-
and official title
business
owned
pensation
Hawthorne - President
All
0
$16,000
Weaver - Vice-Presi-
dent and Treasurer
All
0
10.666
Total
$26,666
At date of dissolution (December 21, 1951)
and for some time prior thereto, all of the
stock of * * * [Texas] was owned by * * *
[the trustees for the church].
*182 One of respondent's agents examined Texas' final return for the period February 1, 1951 through December 21, 1951. In a report dated February 23, 1954, the examining officer, after discussing three adjustments with Ross, proposed a deficiency of $8,408.04. Ross agreed to these adjustments. A check in the amount of $8,408.04 and a check for interest in the amount of $998.71 were transmitted in payment. Delaware's returns for fiscal 1952 through 1956 reported compensation to officers Thornton, president-treasurer, and Ross, vice president-secretary, as follows (in even dollars) Name of officer
Fiscal 1952
Fiscal 1953
Fiscal 1954
Fiscal 1955
Fiscal 1956
Thornton
$ 2,667
$ 6,000
$ 6,000
$ 6,000
$11,000
Ross
2,667
6,000
6,000
6,000
11,000
Totals
$ 5,334
$12,000
$12,000
$12,000
$22,000 Each of these returns stated that Thornton and Ross owned the Delaware stock equally and they acquired their respective interests on November 13, 1951. Delaware's return for fiscal 1958 reported the following schedule for compensation of officers (in even dollars): Time devoted
Amount of
Name of officer and official
to business
Stock owned
compensation
title
Thornton - President
All
50%
$18,000
(acquired 11/13/51)
Ross - Exec. Vice Pres., Ass't
As required
50%
6,000
Treas., Sec'y
(acquired 11/13/51)
Burle C. Hawthorne - Vice
All
10,200
Pres., Gen. Manager
Jack W. Thigpen - Vice Pres.,
All
10,750
Director of Sales and Promotion
Jessie L. Stockard, Jr., Vice
All
10,200
Pres., Director of Engineering
and Research
Henry Murdock - Vice Pres., (in
All
8,800
charge of Rock Bit Division)
Sidney J. Sherwood - Treas.,
All
10,200
Comptroller
Mrs. Blanche Fredericks, Ass't
All
5,140
Secretary
Total
$79,290
*183 Burle C. Hawthorne and Jessie L. Stockard, Jr., were Hawthorne's son and son-in-law, respectively. The returns of the Hawthornes from 1949 through 1956 and the returns of the Weavers from 1951 through 1956 reported salaries from Texas and Delaware, as follows: Hawthornes
Weavers
Received from Texas: 1949
$29,250
*
1950
18,000
*
1951
16,500
$11,000
Received from Delaware: 1951
$ 1,500
$ 1,000
1952
18,000
12,000
1953
18,000
12,000
1954
18,000
12,000
1955
18,750
12,500
1956
15,750
16,000
Delaware employed Hawthorne from December 21, 1951 through 1958, and Weaver from December 21, 1951 through 1957. Both employments were based on a month to month verbal arrangement. Texas' returns for fiscal years ending January 31, 1949, January 31, 1950 and December 21, 1951, and Delaware's returns for fiscal years ending May 31, 1952 through May 31, 1956 and fiscal year ending May 31, 1958, reported net sales, compensation of officers, amortization of patents, royalties expense, patterns and dies expense and net income (or loss), as follows (in even dollars): Compen-
Amorti-
sation
zation
Patterns
Net
income
Fiscal year
Net sales
of officers
of patents
and dies
Royalties
(or loss)
Texas
1949
$ 389,563
$32,000
$1,374
*
*
$113,063
1950
484,437
48,000
1,374
*
$ 61,970
10,944
12-21-51
845,599
26,666
626 **
*
95,385
169,396
Delaware
1952
$ 589,000
$ 5,333
*
$3,195
$175,652
$ 49,916
1953
1,361,822
12,000
*
1,192
405,712
32,922
1954
1,010,412
12,000
*
1,424
301,308
3,674
1955
1,293,396
12,000
*
1,350
322,681
34,043
1956
2,051,308
22,000
*
*
424,197
153,834
1958
2,271,048
79,290
*
*
398,786
(7,349)
*184 Texas' returns for fiscal 1949, 1950 and December 21, 1951, reported the following amortization of patents schedules (in even dollars): Asset (Patent No.
Remain-
Fiscal year
and Date of Issue)
Acquired
Cost
ing life
Amortization
1949
1,919,553 ( 7-25-33)
2-4-48
$1,636
2 1/2 yrs.
$ 654
2,224,345 (12-10-40)
2-4-48
3,217
9 5/6 yrs.
327
2,233,260 ( 2-25-41)
2-4-48
3,959
10 1/12 yrs.
392
Totals
$8,814
$1,374
1950
1,919,553 ( 7-25-33)
2-4-48
$1,636
1 1/2 yrs.
$ 654
2,224,345 (12-10-40)
2-4-48
3,217
8 5/6 yrs.
327
2,233,260 ( 2-25-41)
2-4-48
3,959
9 1/12 yrs.
392
Totals
$8,814
$1,374
Dec. 21, 1951
Patents, patterns
1948
$8,814
Life of
$ 626
and dies
patent The balance sheets on these same returns reflected the following assets (in even dollars): Balance
Amount
Fiscal year
sheet as of
Description of asset
of asset
1949
1-31-49
Patents, patterns and dies (net)
$15,264
1950
1-31-50
Patents, patterns and dies
13,890
2- 1-51
Patents (net)
12,889
Dec. 21, 1951
12-21-51
Patents, patterns and dies
8,814
12-21-51
Patents pending
7,825
*185 Pursuant to the exclusive license agreement of February 1, 1949, the following amounts were paid to Hawthorne and Weaver (in even dollars): Year
Paid by
Hawthorne
Weaver
Total
1951
Texas
$105,044
$ 105.044
1952
Delaware
129,776
$ 35,764
165,540
1953
Delaware
94,738
31,579
126,318
1954
Delaware
83,431
27,810
111,241
1955
Delaware
111,053
37,017
148,071
1956
Delaware
135,387
45,129
180,517
1957
Delaware
113,322
37,774
151,097
1958
Delaware
98,025
32,675
130,700
Totals
$870,780
$247,751
$1,118,532 The returns of the Hawthornes from 1951 through 1953 reported the respective amounts of $105,044, $129,776 and $94,738 as longterm capital gains, with the following explanation: [2]
"Royalties collected on sale of patents, the sale having occurred February 4, 1948, the patents having been acquired prior to February 25, 1941." The returns of the Weavers from 1951 through 1953 reported the respective amounts of $35,764 and $31,579 as long-term capital gains, with the following explanation: "Royalties collected on sale of patents, the sale having occurred February 4, 1948, the patents having been acquired prior to *186 February 25, 1941. (Patents acquired by gift in 1952, with donee using donor's basis)" Respondent determined these amounts reported as long-term capital gains to be ordinary income from royalties. The returns of the Hawthornes for 1949 and 1950 reported as long-term capital gains "Royalties collected on sale of patents [acquired] prior to 2/25/41 [and sold] 2/4/48" in the respective amounts of $56,452.72 and $56,246.63. One of respondent's agents audited the 1949 return. In a report dated December 5, 1951, the examining officer proposed no adjustment to the long-term capital gain treatment of royalties. On May 23, 1952, Delaware, by Ross, wrote the following letter to T. D. McGown, trustee for the church: "From an accounting stand point it appears desirable to establish May 31st as the close of our fiscal year. We would like very much to do so * * * for my own personal convenience * * * and then, too, we will have reached an earnings point (for the first fractional year's operations) at which our tax load may be minimized. "Under our agreement with you, *187 and if we adopt a fiscal year ending May 31, we shall be required to make arrangements for payment of the royalties accrued, because the contract provides that such 'shall become due 60 days after the close of business each year'. It is because of that provision of the contract that Mr. Thornton and I wish your early consideration of the following: "(a) By June we will have made the second installment payment (app. $36,000.00) on the 1951 income tax. You can see that the first two installments have required about $12,000.00 per month cash reserve. However, after making this second installment, our cash requirement in August and November will be reduced to $15,000.00 payment in each of such months. Thus our cash reserve requirements will be about $5,000.00 per month to pay the last two installments. "(b) Within two and one-half months of May 31 (or by August 15) we will have to start making quarterly payments on the income tax accrued as of May 31 - provided, of course, we elect to use that date as the close of our fiscal year. The tax should amount to $10,000.00 or $12,000.00. Such would have to be paid in sums of about $4,000.00 each for the first two installments - that is on *188 August 15 and November 15. "(c) We are in the process of making arrangements with certain of our dealers in Canada whereby they will purchase inventories on consignment with them. To the extent we are able to do this, our cash position, as you can see, will be strengthened and we will have less investment in current inventories. "(d) We are most anxious to reduce as rapidly as possible the principal of the indebtedness on present notes owing to the Church and to Messrs. Hawthorne and Weaver. We believe that substantial payments may be made thereon if you are willing to accept a series of monthly notes to cover our liability to you on the accrued royalty account, and if the first payment on the series were deferred to May 1953. In other words, suppose that the total accrued royalties at May 31 were $84,000.00, then we would execute a series of 12 notes in principal sum of $7,000.00 each, payable monthly beginning May 15, 1953, and bearing interest at 3% as provided in the contract. In the meantime we propose to pay as much on the principal of the present notes as our current working fund position will permit. While we cannot definitely commit ourselves as to the amount of the monthly *189 payments proposed to be made on the present notes, we believe that beginning with June or July this year we will be able to pay $6,000.00 or $8,000.00 per month, such payments to be applied 1/4 on your note and 3/4 on the note due Messrs. Hawthorne and Weaver." On May 27, 1952, McClendon wrote Delaware, "Attention: Mr. Ross," as follows: "I discussed this matter with Mr. McGown [and] * * * Mr. Tellepsen [Trustees for the Church] and both have authorized me to inform you that your suggestions with reference to executing a series of notes for royalty which accrues prior to May 31st will be satisfactory to the Trustees. "The Trustees felt, however, that they should have the consent of Mr. Hawthorne and Mr. Weaver, and Mr. Ross agreed that this consent should be given and that he would arrange for the execution of two series of notes covering the deferred payments." At all material times the church intended to discharge its obligations under the Texas stock sale agreement with the amounts due it under the December 20, 1951 sales agreement with Delaware. In May 1952, Delaware was short of cash. It agreed with the church to execute notes for the amounts due under their agreement. *190 Similarly, Hawthorne and Weaver agreed to defer the amounts due under their agreement with the church. Thereupon, and as a matter of convenience, Delaware, the church, Hawthorne and Weaver agreed, as follows: Each year Delaware would execute three notes payable to the trustees for the church with two of the notes representing the amounts due Hawthorne and Weaver, respectively, from the church. The trustees for the church would then endorse these latter two notes to Hawthorne and Weaver, respectively. On July 3, 1952, July 29, 1953 and August 12, 1954, Delaware, by Thornton, executed and delivered a series of three promissory notes to the trustees for the church payable to the trustees on or before April 15 of 1954, 1955 and 1956, respectively, with interest at 3 per cent per annum from July 30, of 1952, 1953 and 1954, respectively, on the unpaid balances. Each of the notes were payable in 12 equal monthly amounts as follows (in even dollars): Amounts
Monthly
Date of notes
of 3 notes
amounts
July 3, 1952
$ 31,961
$2,663
57,099
4,758
19,033
1,586
July 29,1953
109,498
9,124
105,127
8,760
35,042
2,920
August 12, 1954
81,718
6,809
77,776
6,481
25,925
2,160
*191 Of the above notes received from Delaware, the trustees for the church endorsed the following ones to Hawthorne and Weaver pursuant to the Texas stock sale agreement: Amount of
Amount
note to
of note
Date of Note
Hawthorne
to Weaver
July 3, 1952
$ 57,099
$19,033
July 29, 1953
105,127
35,042
August 12, 1954
77,776
25,925
From fiscal year ending May 31, 1952 through fiscal year ending May 31, 1958, Delaware's books and records disclosed accruals of the 20 per cent royalties due under the December 20, 1951 agreement with the trustees for the church. The notes delivered, executed and made payable to the trustees for the church were drawn in the same amounts. These notes and the payments thereon are reflected in the following schedule (in even dollars): Notes en-
Notes
Notes
Fiscal year
dorsed to
endorsed
retained
ending May 31
Hawthorne
to
by
Total
Weaver
church
1952
$ 57,099
$ 19,033
$ 31,961
$ 108,093
1953
105,127
35,042
109,498
249,669
1954
77,776
25,925
81,718
185,420
1955
100,317
33,439
64,816
198,573
1956
130,522
43,507
87,014
261,044
1957
134,757
44,919
89,838
269,515
1958
122,703
40,901
81,802
245,407
Total
$728,304
$242,768
$546,650
$1,517,723
Unpaid portion of notes at May 31,
1958: (a) Notes of fiscal 1958
$122,703
$ 40,901
$ 81,802
$ 245,407
(b) Notes of fiscal 1957
44,919
14,973
29,946
89,838
Total unpaid portion at May 31, 1958
$167,622
$ 55,874
$111,748
$ 335,245
Total notes paid by Delaware at May
$560,682
$186,894
$434,901
$1,182,477
31, 1958
*192 The trustees for the church, or McClendon, deposited the payments on the notes retained by the church in the latter's bank account, from which only the bishop had the right to withdraw funds. The bishop used such funds for church purposes, and, on occasion, reported to the trustees the various uses. The returns of the Hawthornes from 1951 through 1953 reported, on separate schedules, long-term capital gains from the sale of 6,900 shares of Texas stock, on an installment method of accounting, as follows (in even dollars): 1951
1952
1953
"Total" consideration
$96,463
Cost and expense of sale
15,345
Realized gain
81,118
Amount received
$18,000
$50,463
$28,000
Gain realized and reported on in-
stallment method
15,128
42,435
23,554 The $96,463 represented three-fourths of the $128,617.72 demand note issued pursuant to paragraph 1(d) of the Texas stock sale agreement. On the schedule for 1951 also appeared the following: "The Episcopal Church, acting by and through its Trustees, agreed to pay an additional consideration of $2,250,000.00 out of net receipts of future business of the corporation. The amount so payable is impossible of valuation, *193 and therefore is not included in the foregoing calculations." On the schedules for 1952 and 1953, the returns reported additional long-term capital gains in the respective amounts of $57,099.46 and $105,127.96. These amounts represented the notes received by the trustees for the church from Delaware and endorsed to Hawthorne pursuant to paragraph 1(a) of the Texas stock sale agreement and were explained as follows: "In addition to the foregoing, against which the entire cost has been allocated, taxpayers received a note from the * * * [church] in the principal amount of $2,250,000, the fair market value of which cannot be determined due to the contingencies under which payments are to be made. In 1952 [and 1953], taxpayers collected thereon the [respective] [sums] of $57,099.46 [and $105,127.96], the entire [amounts] of which * * * [are] reported as [gains]." In the notices of deficiency to the Hawthornes, respondent increased the expenses for the sale of the Texas stock reported on the 1951 through 1953 returns, respectively, from $15,345 to $26,595. In addition, respondent determined that the respective amounts of $57,099.26 and $105,127.96 received from the *194 trustees for the church in 1952 and 1953 "as a payment on the $3,000,000 obligation" were taxable as ordinary income. The returns of the Weavers from 1951 through 1953 reported, on separate schedules, long-term capital gains from the sale of 2,300 shares of Texas stock, on an installment method of accounting, as follows (in even dollars): 1951
1952
1953
"Total" consideration
$32,154
Cost and expense of sale
5,115
Realized gain
27,039
Amount received
$ 6,000
$17,154
$ 9,000
Gain realized and reported on in-
stallment method
5,045
14,425
7,568 The $32,164 represented one-fourth of the $128,617.72 demand note issued pursuant to paragraph 1(d) of the Texas stock sale agreement. On the schedule for 1951 also appeared the following: "The Episcopal Church, acting for and through its Trustees, agreed to an additional consideration of $750,000 out of net receipts of future business of the corporation. The amount so payable is impossible of valuation, [and] therefore is not included in the foregoing collection." On the schedules for 1952 and 1953, the returns reported additional long-term capital gains in the respective amounts of $19,033.19 *195 and $35,042.66. These amounts represented the notes received by the trustees for the church from Delaware and endorsed to Weaver pursuant to paragraph 1(a) of the Texas stock sale agreement and were explained as follows: "In addition to the foregoing, against which the entire cost has been allocated, taxpayers received a note from the * * * [church] in the principal amount of $750,000.00, the fair market value of which cannot be determined due to the contingencies under which payments are to be made. In 1952 [and 1953] taxpayers collected thereon the [respective] [sums] of $19,033.19 [and $35,042.66], the entire [amounts] of which * * * [are] reported as [gains]." In the notices of deficiency to the Weavers, respondent increased the expenses for the sale of the Texas stock reported on the 1951 through 1953 returns, respectively, from $5,115 to $8,865. In addition, respondent determined that the respective amounts of $19,033.19 and $35,042.66 received from the trustees for the church in 1952 and 1953 "as a payment on the $3,000,000 obligation" were taxable as ordinary income. The respective returns of the Hawthornes and Weavers from 1954 through 1956 reported the *196 following items of interest income and long-term capital gains (in even dollars): 1954
1955
1956
Hawthornes
Interest - note from church
$ 3,903
$ 3,000
$ 3,720
Capital gains: (a) Royalties collected
83,431
111,053
135,387
(b) Gain on installment sale of Texas
stock
77,776
100,317
130,522
Weavers
Interest - note from church
1,300
1,008
1,249
Capital gains: (a) Royalties collected
27,810
37,017
45,129
(b) Gain on installment sale of Texas
stock
25,925
33,439
43,507 The returns for the Hawthornes explained the royalties as follows: "Royalties collected on sale of interest in patents, the sale of which occurred on February 4, 1948, the patents having been acquired prior to February 25, 1941." The returns for the Weavers explained the royalties as follows: "Royalties collected on sale of interest in patents, the sale of which occurred February 4, 1948, the interest in patents having been acquired by gift in 1952, basis being that of donor and having been fully recovered in prior years." The returns of the Hawthornes and Weavers explained the gain on installment sale of Texas stock on October 31, 1951, with the basis having *197 been recovered in prior years, as follows (in even dollars): Hawthorne
Weaver
Total
Shares of Texas sold
6,900
2,300
9,200
Original sum receivable under contract
$2,250,000
$750,000
$3,000,000
Less: Payments received in prior years
162,227
54,076
216,304
Balance receivable 1-1-54
$2,087,772
$695,923
$2,783,695
Payments received in 1954
77,776
25,925
103,701
Balance receivable 12-31-54
$2,009,996
$669,997
$2,679,993
Payments received in 1955
100,317
33,439
133,756
Balance receivable 12-31-55
$1,909,678
$636,558
$2,546,237
Payments received in 1956
130,522
43,507
174,029
Balance receivable 12-31-56
$1,779,156
$593,051
$2,372,207
In June, 1954, Hawthorne and Weaver, and their respective wives, appointed Ross and Thornton to represent them before the United States Treasury Department. In October 1954, Hawthorne and Weaver revoked these previous powers of attorney and appointed instead Marvin K. Collie and John G. Heard. McClendon and T. D. McGown, a trustee for the church, were employed by the same firm as Collie and Heard. McClendon either prepared or approved for Bishop Quin the various documents in which the trustees *198 for the church were a party. In some instances he acted as a liaison between the bishop and the trustees for the church. On June 27, 1956, the trustees for the church and Delaware, by Thornton, entered into the following letter agreement, written by the trustees: "Pursuant to an agreement * * * dated December 20, 1951, we, as trustees for the * * * [Church] sold to you all of our rights as such trustees in an exclusive license * * * dated February 1, 1948, [executed February 1, 1949,] * * * and * * * you agreed to pay to us as such trustees a royalty equal to 20% of the net sales * * *. "You have advised us that you have developed certain improvements to the tools therefore manufactured by you under the License. Such improved tools are commonly known as 'insert bits'. You have further advised us that, after some months of development and testing, said 'insert bits' now are being sold in substantial quantities. However due to the high costs of development of such new tools and the extremely competitive market in which such new tools are being sold it is necessary for you to have an extra inducement to continue to sell such insert bits. This amendment shall be, pursuant to *199 our oral agreement, as of June 1, 1954. "We have investigated your representations and we believe that it would be fair, reasonable and proper to compute the above described royalty on such insert bits at the rate of 20% of 55% of the net sales on said bits." * * *
On the same date, Hawthorne and Weaver and the trustees for the church entered into the following letter agreement, written by Hawthorne and Weaver: "You have transmitted to us a copy of your letter of even date herewith whereby you agree with * * * [Delaware] to reduce the payments to you under your assignment of December 20, 1951, to * * * [Delaware]. "For similar reasons we have agreed to reduce our payments under our [exclusive license] agreement * * * [dated] February, 1948, [executed February 1, 1949] with * * * [Delaware]. "As you know, our * * * [Texas stock sale agreement] with you dated October 31, 1951 * * * provided that you shall make payment to us of at least ten percent (10%) of the gross sales of * * * [Texas]. "In view of your amendment to your assignment of * * * [Delaware], we agree that the terms of the * * * [Texas stock sale agreement] shall be amended that in no *200 event shall the payments be required to be made under the Agreement exceed 66 2/3% of the amount paid to you by * * * [Delaware] by virtue of the assignment dated December 20, 1951 as amended by the [letter] Agreement of June 27, 1956. * * *
"Nevertheless, it is specifically understood that this amendment [effective as to all payments due on and after June 1, 1955] shall not be construed to reduce the total amount payable under the [Texas stock sale] Agreement and in all other respects, except as specifically amended hereby, * * * [such] Agreement shall remain in full force and effect." * * *
On July 27, 1956, Hawthorne and Weaver and Delaware, by Thornton, entered into a letter agreement, written by Hawthorne and Weaver. This agreement amended the exclusive license agreement of February 1, 1949, as follows: "[The] above described royalty on * * * insert bits [will be computed] at the rate of 12 1/2% of 55% of the net sales on said bits." Subsequent to October 31, 1951, the trustees for the church have sought continuously to protect the church's interest in the exclusive license agreement of February 1, 1949 by considering the coverage of such agreement *201 to new products manufactured by Delaware and by investigating the possibilities of patent infringement by others of the patents covered by such agreement. The total sale price stated in the October 31, 1951 Texas stock sale agreement between Hawthorne and Weaver and the trustees for the church was $3,128,617.72. The portions of this amount attributable to the respective stock sold by Hawthorne and Weaver were as follows (in even dollars): Hawthorne
Weaver
Total
Consideration for net current assets
$ 96,463
$ 32,154
$ 128,617
Consideration for remainder of assets
2,250,000
750,000
3,000,000
Total consideration
$2,346,463
$782,154
$3,128,617 The sale price was not computed by mathematical or cost formulas, but appeared to be a reasonable amount to all parties to the transaction. The Hawthornes filed declarations of estimated tax as follows: Declaration
Date of filing
1951
2/21/51
1951-amended
1/14/52
1952
3/15/52
1952-amended
9/15/52 These declarations reported the following (in even dollars): 1951
1951-amended
1952
1952-amended
declaration
declaration
declaration
declaration
Estimated tax
$10,000
$25,000
$32,800
$65,000
Estimated tax withheld and
2,700
2,800
2,800
3,300
to be withheld
Balance
7,300
22,200
30,000
61,700
Amounts previously paid
7,300
15,000
Unpaid balance of estimated
7,300
14,900
30,000
46,700
tax
Amount paid with
1,825
14,900
7,500
23,350
declaration
*202 In the notice of deficiency to the Hawthornes for 1951 and 1952, respondent determined additions to tax for substantial understatements of estimated tax as follows (in even dollars): 1951
1952
Tax liability reported on return
$33,975
$ 64,325
Tax liability determined by respondent
82,085
153,975
Less: Tax withheld
$ 2,800
$ 3,300
Estimated tax paid
22,200
25,000
61,025
64,325
Underestimated amount
$57,085
$ 89,650
Addition to tax
$ 3,425
$ 5,379
Opinion The first issue is essentially one of fact. It is concerned primarily with whether the amounts paid under a 1949 licensing agreement represented part of the purchase price for the transfer of all substantial rights to certain patent applications and hence are taxable as capital gains. Respondent relies on certain minutes of a directors' meeting held on February 4, 1948, and admittedly erroneous statements in the income tax returns, all of which are set out in greater detail in our findings, to support his position that the patent in question having been "sold" to Texas in 1948 could not again be transferred in 1949. While certain language in the minutes might *203 be construed as some evidence of Hawthorne's prior conveyance, for a lump-sum consideration, of one of the patent applications (612,416) referred to in the subsequent transfer, such a finding would be inconsistent with the 1949 agreement and the stipulated fact that the amounts in controversy were paid pursuant to it. It would also require disregarding the categorical testimony to the contrary under oath. The minutes apparently did not clearly state the intention of the directors. The most we can say is that the directors in 1948 were authorized to purchase the patent application in controversy and that they did purchase such application in its entirety by means of the 1949 agreement. It is not without significance that the same agreement encompassed another patent application (794,239), not referred to in the minutes, for the use of which some, if not all, of the royalties in question were paid. It is hence, as a factual conclusion, the 1949 agreement which fixed the tax consequences of the transaction. As to this, respondent's contention is that Hawthorne's "substantial shareholding interest in the so-called transferee [Texas] is * * * an indication that he did not release substantially *204 all the rights of the ownership in the patent." This proposition, coupled with other circumstances, might be entitled to some weight. See Watkins v. United States, (C.A. 2) 252 F. 2d 722, certiorari denied 357 U.S. 936. But, standing alone as in this case, it is insufficient to negate the transfer of all substantial rights to the applications. Edward C. Myers, 6 T.C. 258; Roy J. Champayne, 26 T.C. 634; Leonard Coplan, 28 T.C. 1189. This is not such a case as Royce Kershaw, 34 T.C. - (June 8, 1960), where the transferor of the patent with his family owned more than 80 per cent of the stock of the transferee, the transaction occurred after 1951, and thus came within the express prohibition of the successor to section 117(o), I.R.C. 1939. Accordingly, we hold that the Hawthornes, by means of the 1949 licensing agreement, transferred all substantial rights to the patent applications and are entitled to treat the royalties therefrom as capital gains. A similar result is required with respect to the Weavers. It cannot be disputed that Weaver received a one-fourth interest in the two patent applications as well as *205 a one-fourth interest in the licensing agreement covering these applications and that thereupon the licensee paid him one-fourth of the royalties due under the agreement. The record is free from doubt that the property interest received was by way of gift [3] and not compensation for services rendered, and that it consisted of incomeproducing property, as distinguished from the bare right to receive royalty income. See Franklin A. Reece, 24 T.C. 187, affd. (C.A. 1) 233 F. 2d 30. Respondent's further contention is the same as that with respect to the Hawthornes. In light of our conclusion there, and under the authority of Bessie B. Hopkinson, 42 B.T.A. 580, affd. (C.A. 2) 126 F. 2d 406, which held that the character of income to a donor passes to his donee, [4] the Weavers are entitled to treat their share of these royalties as capital gains. *206 The remaining issue presents a closer question. The numerous documents and steps undertaken by the parties, as described in detail by our findings, may be summarized as follows: In October 1951, petitioners Hawthorne and Weaver transferred their Texas stock to a church in consideration of a demand note representative of Texas' net current assets ($128,617) and $3,000,000 payable in minimum annual installments of 10 per cent of all corporate sales. In December of that year the church liquidated Texas and sold its assets, including its rights under the 1949 licensing agreement, to Delaware, a corporation formed in the preceding month by petitioners' advisors (Ross and Thornton) who subscribed equally to its capital of $1,000. Delaware agreed to (1) assume the church's demand note to petitioners and the obligations under the licensing agreement; (2) accept the assets subject to the church's obligation to petitioners; (3) pay the church 20 per cent royalties on all products manufactured under the licensing agreement; and (4) pay $48,712 to be evidenced by a note. Shortly thereafter, the parties agreed that in each year Delaware would execute and deliver three notes in different amounts *207 to the church in satisfaction of its 20 per cent obligation to it and the church would endorse two of these notes to petitioners in satisfaction of its obligation to them. Pursuant to this agreement, petitioners received endorsed notes during the controversial years and reported them as capital gains in their respective returns, in addition to their share of payments on the demand note of $128,617. Respondent accepted the capital gains treatment for the demand note on an installment method of accounting. The present controversy arises because respondent determined that the endorsed notes were ordinary income, petitioners of course contending that they were part of the purchase price for the sale of their stock. While it is true that substance rather than form governs the net effect of a transaction, Gregory v. Helvering, 293 U.S. 465, and that separate steps in an integrated plan must be viewed as a whole, Minnesota Tea Co. v. Helvering, 302 U.S. 609; it is equally true that an apparently good faith, arm's length transaction was entered into first between the church and petitioners and then between Delaware and the church. This has so little of unreality *208 that upwards of a million dollars was paid under it. Petitioners were not entitled to any more than they received and what they were entitled to was apparently a fair evaluation of the asset they disposed of. Cf. Emanuel N. (Manny) Kolkey, 27 T.C. 37, affd. (C.A. 7) 254 F. 2d 51; Aqualane Shores, Inc., 30 T.C. 519, 526, affd. (C.A. 5) 269 F. 2d 116. We cannot say that the sale of the stock was not entitled to capital gains treatment. Estate of Ernest G. Howes, 30 T.C. 909, affirmed sub nom. Commissioner v. Johnson, (C.A. 1) 267 F. 2d 382. Respondent does not argue, as was held in Kolkey, that the $3,000,000 obligation was "grossly excessive." But even if he had, testimony that the stock was sold [5] for $3,128,617, the endorsed notes discharged part of this obligation and the total amount was a "fair estimate of the worth of the company" was uncontroverted. And, at respondent's request, we have found that the sale price "appeared to be a reasonable amount" "to all parties to the transaction." To this it might be added that it is a fair inference from the record that at some future time the entire *209 consideration will be satisfied. [6] Lastly, respondent's recognition of a sale in the first instance [7] is clearly irreconcilable with his present position that a statutory reorganization was effected. Not only was the requisite "continuity of interest" in the transferee absent, Pinellas Ice & Cold Storage Co. v. Commissioner, 287 U.S. 462; LeTulle v. Scofield, 308 U.S. 415, but in addition, the evidence affirmatively indicates that individuals other than petitioners controlled the transferee.[8] The fact that Delaware employed petitioners for several years did not give them control, but called for receipt by them of ordinary income. Certainly less "control" existed here than in Estate of Ernest G. Howes, supra, where the selling shareholders were given long-term employment contracts and voting rights. Our conclusion is that petitioners' pro rata gains from the sale of the Texas stock should be recomputed on an installment method of accounting, section 44, I.R.C. 1939, for each of the years in issue, with $3,128,617 employed as the total contract price. Accordingly, and to take into account other concessions and adjustments, including those *210 disposed of under the first issue, *211 Decisions will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Earl M. Weaver and Tudor T. Weaver, Docket No. 59980; Herb J. Hawthorne and Estate of Cordie Hawthorne, Deceased, E. P. Ross, Independent Executor, Docket No. 75170; Earl M. Weaver and Tudor T. Weaver, Docket No. 75171.↩
*. Application Serial No. 659,423 filed on May 15, 1957. ↩
**. Weaver was listed as a co-inventor. ↩
***. Application Serial No. 463,202 filed October 19, 1954.↩
*. Not indicated by the record.↩
*. The return made no reference to this category of deduction. ↩
**. Reflected in the depreciation schedule.↩
2. The explanation appearing in the 1951 return was identical to that for 1952 and 1953 in all material respects.↩
3. Respondent accepted this characterization in the stipulated fact that "Hawthorne assigned an undivided 1/4th interest as a gift to * * * Weaver * * *."↩
4. "There is thus discernible a Congressional intent to treat a donee as standing for income tax purposes in the shoes of the donor, explicit in regard to basis and holding period, and inferential as to capital gains." Bessie B. Hopkinson, 42 B.T.A. 580, 585↩.
5. On brief, respondent admits that the Texas stock sale agreement "provided for the payment of $3,000,000.00 * * * [and] [in] addition, the Church Trustees were to execute a demand note for the book value of the net current assets * * *." ↩
6. The last of the patents under which Delaware operated was granted in 1958. Since almost one-third of the obligation was discharged within 7 years, it is reasonable to expect that the remaining amounts will be paid within the life of this last patent. ↩
7. In an attempt to confine the total consideration realized from the sale of the Texas stock to $128,617, respondent states "[the] long term capital gain on said sale of stock, reported in installments, * * * [except] for an increase made to the cost * * *, [was] accepted * * * and no issue on said transaction was raised by the pleadings." This contention is totally without merit. The petitions, as well as petitioners' concessions on brief, make it clear that the original position taken on the returns was erroneous.↩
8. And for the term "reorganization" to be applicable, the sale agreement would have to be considered a "security," cf. Alan O. Hickok, 32 T.C. 80↩, which it clearly was not.